SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Burgos v. State of New Jersey (A-55-14) (075736)**

**Argued May 6, 2015 – Decided June 9, 2015**

**LaVECCHIA, J., writing for a majority of the Court.**

In this appeal the Court considers whether a 2011 statutory enactment that requires the State to make certain annual contributions to public pension funds created an enforceable contract that is entitled to constitutional protection.

The State's public pension systems are defined-benefit plans, which guarantee participants a calculable amount of benefits payable upon retirement based on the participant's salary and time spent in the pension system. The benefits are paid using revenues received from employee contributions, public employer (i.e., State) contributions, and investment returns. Under the statutes governing the pensions systems, the Legislature has required the State to contribute not only the present value of the actual benefits that active pension members earned in the current year, but also the amounts necessary to amortize the systems' unfunded liabilities over a period of years. The combination of these amounts is known as the annually required contribution (ARC).

In 2011, with the enactment of L. 2011, c. 78 (Chapter 78), the Legislature added language explicitly declaring that each member of the State's pension systems "shall have a contractual right to the annual required contribution amount" and the failure of the State to make the required contribution "shall be deemed to be an impairment of the contractual right." A separate statutory provision, enacted earlier, required the State to increase its ARC beginning with fiscal year 2012 (FY12) over the course of seven years at increments of 1/7 of the ARC per year, until the contribution covered the full ARC.

The State made the required contributions in FY12 and FY13, and the Appropriations Act signed into law for FY14 included the required contributions of 3/7 of the ARC. In February 2014, the Governor released the FY15 proposed budget, which also included funding to satisfy the State's required payment (i.e., 4/7 of the ARC). On May 20, 2014, the Governor issued Executive Order 156, which reduced the State payments into the pension systems for FY14, explaining that the reduction was due to a severe and unanticipated revenue shortfall. Instead of paying the required 3/7 of the ARC contribution, which totaled $1.582 million, the State made a total contribution of $696 million for FY14. The next day, citing new information that placed the State's projected revenue at less than previous projections, the State Treasurer announced that the proposed budget for FY15 was being revised to reduce the amount that would be contributed to pension systems. The revised FY15 budget thus advanced would include a total contribution of $681 million, reflecting $1.57 billion less than what was required.

In response, plaintiffs – individuals and unions acting on behalf of hundreds of thousands of New Jersey State public employees – filed complaints alleging statutory violations, impairment of contractual rights under the New Jersey and United States Constitutions, violations of substantive and procedural due process under both Constitutions, a violation of plaintiffs' Equal Protection rights, promissory estoppel, and violations of the New Jersey Civil Rights Act. Plaintiffs sought injunctive and mandamus relief for both FY14 and FY15. The trial court consolidated plaintiffs' claims into one action.

With respect to the budgetary action involving the then-imminently concluding FY14, the Law Division upheld the Governor's determination not to make the required FY14 ARC payment, declaring the action lawfully within the Executive's emergency powers and reasonable and necessary under the Contracts Clauses of the New Jersey and United States Constitutions. The court held that plaintiffs' claims for FY15 were not ripe because the Legislature had not yet passed a FY15 Appropriations Bill.

When the Legislature passed its FY15 Appropriations Bill, it included the full 4/7ths required ARC, or $2.25 billion. This was financed, in part, by companion bills establishing new taxes whose projected revenue streams were incorporated into the Legislature's anticipated revenue for FY15. On June 30, 2014, Governor Christie exercised his line-item veto authority deleting, among other items, $1.57 billion of the State's required pension payment from the Appropriations Act. In his line-item veto message, Governor Christie stated that he opposed raising taxes to pay for the budget deficit, that he eliminated the new revenues projected for new taxes as presented by the Legislature, and cited his constitutional responsibility to deliver a balanced budget as the reason for reducing the State's FY15 contribution. The Legislature did not take action to override the line-item veto. Therefore, the 2015 Appropriations Act became law, subject to the line-item veto changes.

Plaintiffs filed amended complaints in the Law Division. The State responded by filing a motion to dismiss, and plaintiffs, in turn, filed a motion for summary judgment. Plaintiffs argued that, in enacting Chapter 78, the State undertook a contractual obligation to make the ARC payment to the pension system and that the State's failure to make the full FY15 ARC payment constituted an impairment of that contract in violation of the Contracts Clauses of the State and Federal Constitutions. Plaintiffs requested that the court require the Legislature and the executive branch to adopt an appropriations act consistent with the contractual obligations outlined in Chapter 78.

The State asserted that Chapter 78 could not create a valid contract right because it violated the Appropriations and Debt Limitation Clauses and the line-item veto provision of the New Jersey Constitution. Even assuming, but not conceding, that an enforceable contract right was created, the State maintained that it did not substantially impair that contract right. Further, again assuming but not conceding that substantial impairment occurred, the State submitted that its decision was reasonable and served a legitimate public purpose.

The trial court issued a detailed and comprehensive opinion on February 23, 2015, that granted summary judgment to plaintiffs on their impairment-of-contract claims and denied defendants' motion to dismiss. The court accepted the argument that Chapter 78 created a contract and that the State's failure to appropriate the full value of ARC in the FY15 Appropriations Act substantially impaired plaintiffs' rights under the contract. In so finding, the court rejected arguments that Chapter 78 was unenforceable as violative of the Debt Limitation Clause, the Appropriations Clause, and the gubernatorial line-item veto power. The court did not order a specific appropriation, but rather determined to give the other branches an opportunity to act in accordance with the court's decree.

The State filed a motion for leave to appeal to the Appellate Division, and shortly thereafter, moved for direct certification to this Court. The motion was unopposed. On April 6, 2015, this Court issued an order granting direct certification, establishing a briefing schedule, and setting the matter down for oral argument on May 6, 2015.

**HELD**: Chapter 78 does not create a legally enforceable contract that is entitled to constitutional protection. The Debt Limitation Clause of the State Constitution interdicts the creation, in this manner, of a legally binding enforceable contract compelling multi-year financial payments in the sizable amounts called for by the statute.

1. No analysis of this matter fairly can commence without initially recognizing the promises made on the State's part toward meeting the scheduled payments to reduce the unfunded liability of the pension systems. Plaintiffs emphasize the many statements praising the bipartisan legislative endeavor and referring to the legislative achievement as a contract. The Court does not question the good intentions of those participating in the enactment of Chapter 78 or that they intended to create a contractual arrangement to address future payment into the funds to promote the fiscal health of the retirement systems. But a strictly legal question is before the Court. That, and that alone, is what must be resolved in this matter of great public importance to members of the public pension systems and citizens throughout the State. (pp. 21-23)

2. Both the New Jersey and Federal Constitutions prohibit the passage of laws impairing the obligation of contracts. Legislation unconstitutionally impairs a contract when it: (1) substantially impairs a contractual relationship; (2) lacks a significant and legitimate public purpose; and (3) is based on unreasonable conditions and unrelated to appropriate governmental objectives. The premise for performing a contract impairment analysis is the existence of a valid enforceable contract under state law. When a contractual relationship is purportedly created through a statute's enactment, two questions must be addressed in analyzing whether a contract was successfully formed: (1) did the Legislature speak with sufficient clarity to evince intent to create a contract right; and (2) did state law grant the Legislature the authority to enter into the binding and enforceable contract. (pp. 23-26)

2

3.   Here, the Legislature and Governor clearly expressed an intent that Chapter 78 create a "contract right" to timely and recurring ARC payments to reduce the unfunded liability of the pension funds.  But, that conclusion does not address the question of authority to do so.  The essential question that must be answered is whether legislative authority could be exercised through Chapter 78 to create a legally binding, enforceable contract compelling future State appropriations to pay down the unfunded liability.  In making such a determination, it is generally recognized that state law governs the existence of a valid contract, even for impairment claims under the Federal Contracts Clause.  The Court therefore turns to New Jersey law that pertains to the legal enforceability of the purported statutory contractual right to Chapter 78's required annual pension payments.  (pp. 26-30)

4.  The Debt Limitation Clause of the New Jersey Constitution provides that the Legislature may not create "a debt or debts, liability or liabilities of the State" that exceed one percent of the amount appropriated in a given fiscal year unless "submitted to the people at a general election and approved by a majority . . . of the voters of the State voting thereon." N.J. Const. art. VIII, § 2, ¶ 3.  The animating principle applied by the Court in its decisions regarding the Debt Limitation Clause is that the State cannot by contract or statute create a binding and legally enforceable financial obligation above a certain amount that applies year to year without voter approval.  Such long-term financial arrangements require voter approval to be enforced; or, such financial promises otherwise avoid the Debt Limitation Clause's interdiction by being regarded as expressions of intent to provide the funding, but they must be subjected to the annual appropriation process for fulfillment in whole, in part, or not at all.  (pp. 30-33)

5.  In Lonegan v. State (Lonegan II), 176 N.J. 2 (2003), the Court confronted a broad challenge to the validity of fourteen New Jersey statutes authorizing contract or appropriations-backed debt.  The Court found that the statutory financing mechanisms did not violate the Debt Limitation Clause because payments on contract or appropriations-backed debt are necessarily left to the Legislature's discretion to appropriate and the State is not legally bound to make such payments.  Among other things, Lonegan II recognized that the variety of financing mechanisms employed today were unheard of when the Debt Limitation Clause was adopted, and noted the difficulty in differentiating among acceptable and unacceptable types of twenty-first century appropriations-backed debt.  In this matter, the trial court based its Debt Limitation Clause analysis on a misperception of the flexibility that was discussed in Lonegan II.  The Lonegan II decision acknowledged the need for flexibility in modern financing, and adjusted for the same in the performance of a Debt Limitation Clause analysis by reducing the prohibited conduct to an easily understood principle:  so long as the State's full faith and credit is not pledged and a legally enforceable financial obligation, above a certain amount and lasting year to year, is not created, without voter approval, no Debt Limitation Clause violation ensues.  As applied in the circumstances presented in Lonegan II, if a financial obligation is made dependent on securing an appropriation from year to year, then parties are apprised of the element of risk and no constitutional debt limitation violation arises.  (pp. 33-37)

6.  Plaintiffs assert that Chapter 78 does not implicate the Debt Limitation Clause because that Clause's language and intent is to prevent the State from creating new debts or liabilities, not to prevent it from paying overdue ordinary expenses.  The Debt Limitation Clause is clearly written to have wide sweep, covering "debts" or "liabilities" created "in any manner," thereby reaching various forms of financial arrangements.  Nothing about that language supports that traditional borrowing scenarios were the only intended prohibited transactions.  The Debt Limitation Clause's prohibition against incurring of future debt or liability is vital and it is broad – sufficiently broad to reach long-term financial obligations addressing so-called operating expenses.  In combination, the Debt Limitation Clause and the Appropriations Clause of the New Jersey Constitution interdict the Legislature from creating a debt or liability, in any manner, in excess of a certain amount that binds the State to appropriate funds in future fiscal years.  (pp. 37-42)

7. Under the Appropriations Clause, the power and authority to appropriate funds is vested in the Legislature.  N.J. Const. art. VIII, § 2, ¶ 2.  The Clause has three requirements:  (1) all withdrawals of money from the State Treasury must be accomplished through legislative appropriation; (2) the Legislature must provide for that appropriation in one law covering only that fiscal year; and (3) the budget created by the appropriations law must be balanced.  Because the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government, there can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over State appropriations.  The Appropriations Clause firmly interdicts the expenditure of state monies through separate statutes not otherwise related to or integrated with the general appropriation act governing the state budget for a given fiscal year.  Given the Legislature's inherent power to disregard prior fiscal enactments, the Court cannot compel the Legislature to appropriate in accordance with other

statutes that are not incorporated into the general appropriation act. In circumstances where legislation sought to bind future legislatures in a manner that implicated both the Debt Limitation and Appropriations Clauses, this Court was careful to note that the legislation survived those Clauses because the Legislature retained its constitutionally enshrined power to annually appropriate funds as necessary for the fiscal health of the State. No such reservation of power can be found in Chapter 78. (pp. 42-49)

8. Applying those principles here, the Legislature and Governor were without power, acting without voter approval, to transgress the Debt Limitation Clause and the corresponding Appropriations and other budget clauses of the State Constitution. The Legislature and Governor, as well as the many interested parties involved in the legislative process, may have included contractual words in Chapter 78, but those words, no matter their clarity, could not create an enforceable contract of the type asserted. Voter approval is required to render this a legally enforceable contractual agreement compelling appropriations of this size covering succeeding fiscal years; otherwise, this agreement is enforceable only as an agreement that is subject to appropriation, which under the Appropriations Clause renders it subject to the annual budgetary appropriations process. In that process, the payment may not be compelled by the Judiciary. The Legislature's strong expression of intent remains clear in Chapter 78, but it does not bind future legislatures or governors in a manner that strips discretionary functions concerning appropriations that the State Constitution leaves to the legislative and executive branches. (pp. 49-53)

9. Because of the importance of maintaining the soundness of the pension funds, the loss of public trust due to the broken promises made through Chapter 78's enactment is staggering. The Court recognizes that the present level of the pension systems' funding is of increasing concern. But this is a constitutional controversy that has been brought to the Judiciary's doorstep, and the Court's obligation is to enforce the State Constitution's limitations on legislative power. The State Constitution simply does not permit Chapter 78's payment provisions to have any more binding effect than that of a contract that is subject to appropriation. To be clear, the Court emphasizes that it is not declaring Chapter 78 unconstitutional. Chapter 78 remains in effect, as interpreted, unless the Legislature chooses to modify it. There is therefore no need to address severability or the mutuality of obligations and the Court leaves those considerations for the political branches. The Court also emphasizes that its analysis does not conflate the issue of the State's obligation to pay pension benefits with the issue whether Chapter 78 legally binds the State annually to make the scheduled payments into the pension systems. The Court's holding is, simply, that Chapter 78 cannot constitutionally create a legally binding, enforceable obligation on the State to annually appropriate funds as Chapter 78 purports to require. (pp. 53-61)

10. That the State must get its financial house in order is plain. The need is compelling in respect of the State's ability to honor its compensation commitment to retired employees. But the Court cannot resolve that need in place of the political branches. They will have to deal with one another to forge a solution to the tenuous financial status of New Jersey's pension funding in a way that comports with the strictures of our Constitution. The Debt Limitation Clause and the Appropriations Clause envisioned no role for the Judiciary in the annual budget-making process and prevent it from having to perform the unseemly role of deciding in that process whether a failure to fully fund a statutory program, including one labeled a contract, was reasonable and necessary. A Contracts Clause analysis would require annual incursions by the Judiciary into second-guessing spending priorities and perhaps even revenue-raising considerations in recurring years. Under the Debt Limitation Clause and the Appropriations Clause, the responsibility for the budget process remains squarely with the Legislature and Executive, the branches accountable to the voters through the electoral process. This is not an occasion for the Judiciary to act on the other branches' behalf. (pp. 61-68)

The judgment of the Law Division is **REVERSED**.

**JUSTICE ALBIN, dissenting**, joined by **CHIEF JUSTICE RABNER**, believes that public workers have protectable contractual rights under the United States Constitution -- as the Legislature and Governor intended in enacting Chapter 78. He expresses the view that Chapter 78 is a binding contract on the State that cannot be nullified without offending the Federal Constitution's Contracts Clause.

**JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON and JUDGE CUFF (temporarily assigned), join in JUSTICE LaVECCHIA's opinion. JUSTICE ALBIN filed a separate, dissenting opinion in which CHIEF JUSTICE RABNER joins.**

4

CHRISTOPHER BURGOS,
Individually and as President
of the State Troopers
Fraternal Association of New
Jersey; JAMES KIERNAN,
Individually and as President
of State Troopers Non-
Commissioned Officers
Association of New Jersey
State, Inc.; STEPHEN STERNIK,
Individually and as President
of State Troopers Superior
Association of New Jersey;
STATE TROOPERS FRATERNAL
ASSOCIATION OF NEW JERSEY, on
behalf of all its present and
retired members; STATE
TROOPERS NON-COMMISSIONED
OFFICERS ASSOCIATION OF NEW
JERSEY, INC., on behalf of
all its present and retired
members; and STATE TROOPERS
SUPERIOR OFFICERS ASSOCIATION
OF NEW JERSEY, on behalf of
all its present and retired
members,

     Plaintiffs-Respondents,

         v.

STATE OF NEW JERSEY;
CHRISTOPHER CHRISTIE,
Governor of the State of New
Jersey; ANDREW SIDAMON-
ERISTOFF, Treasurer of the
State of New Jersey; NEW
JERSEY STATE SENATE; and NEW
JERSEY STATE GENERAL
ASSEMBLY,

     Defendants-Appellants,

and

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO;
PROFESSIONAL FIREFIGHTERS
ASSOCIATION OF NEW JERSEY,
IAFF, AFL-CIO; NEW JERSEY
FRATERNAL ORDER OF POLICE;
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, COUNCIL 73;
AMERICAN FEDERATION OF
TEACHERS NEW JERSEY STATE
FEDERATION, AFL-CIO;
INTERNATIONAL FEDERATION OF
PROFESSIONAL AND TECHNICAL
ENGINEERS, AFL-CIO & CLC,
LOCAL 195; HEALTH
PROFESSIONAL AND ALLIED
EMPLOYEES, AFT, AFL-CIO; NEW
JERSEY STATE AFL-CIO; SANDRA
P. COHEN; MICHAEL A.
JUSTINIANO; DOMINICK MARINO;
DONNA CHIERA; DIANE CAMERON;
and RUSSELL LEAK,

      Plaintiffs-Respondents,

         v.

CHRIS CHRISTIE, as Governor
of the State of New Jersey;
NEW JERSEY DEPARTMENT OF THE
TREASURY; and ANDREW P.
SIDAMON-ERISTOFF, Treasurer,
State of New Jersey,

      Defendants-Appellants,

      and

NEW JERSEY EDUCATION
ASSOCIATION; NEW JERSEY STATE
POLICEMEN'S BENEVOLENT
ASSOCIATION, INC.; NEW JERSEY
STATE FIREFIGHTERS' MUTUAL

BENEVOLENT ASSOCIATION; AMERICAN FEDERATION OF STATE, COUNTY, AND MUNICIPAL EMPLOYEES, COUNCIL 1, AFL-CIO; CHRISTINE SAMPSON-CLARK; HEIDI OLSON; PATRICIA PROVNICK; KEITH DUNN; PATRICK COLLIGAN; MARC KOVAR; TIM DEUTSCH; KYLE HUGHES; JOHN E. MURPHY, JR.; LANCE P. LOPEZ, SR.; THE NEW JERSEY PRINCIPALS AND SUPERVISORS ASSOCIATION; JANET S. ZYMROZ; JOHN C. ALFIERI, JR.; HOPE GRANT; and ROSARIO CAPACCIO,

     Plaintiffs-Respondents,

        v.

STATE OF NEW JERSEY; CHRISTOPHER J. CHRISTIE, as Governor of the State of New Jersey; NEW JERSEY DEPARTMENT OF THE TREASURY; and ANDREW P. SIDAMON-ERISTOFF, Treasurer, State of New Jersey,

     Defendants-Appellants,

        and

PROBATION ASSOCIATION OF NEW JERSEY, PROFESSIONAL CASE-RELATED UNIT; PROBATION ASSOCIATION OF NEW JERSEY, PROFESSIONAL SUPERVISORS UNION; DWIGHT COVALESKIE; GAVIN CUMMINGS; and ELLEN CRIBBIN,

     Plaintiffs-Respondents,

        v.

3

STATE OF NEW JERSEY;
CHRISTOPHER J. CHRISTIE, as
Governor of the State of New
Jersey; NEW JERSEY DEPARTMENT
OF THE TREASURY; and ANDREW
P. SIDAMON-ERISTOFF,
Treasurer, State of New
Jersey,

      Defendants-Appellants.

Argued May 6, 2015 – Decided June 9, 2015

On appeal from the Superior Court, Law
Division, Mercer County.

Jean P. Reilly, Assistant Attorney General,
argued the cause for appellants (John J.
Hoffman, Acting Attorney General, attorney;
Ms. Reilly, John P. Bender, Assistant
Attorney General, Gabriel I. Chacon, and
David M. Reap, Deputy Attorneys General on
the briefs).

Steven P. Weissman and Kenneth I. Nowak
argued the cause for respondents (Weissman &
Mintz, attorneys for Communications Workers
of America, AFL-CIO, American Federation of
State, County, and Municipal Employees,
Council 73, American Federation of Teachers
New Jersey State Federation, AFL-CIO, Health
Professional and Allied Employees, AFT, AFL-
CIO, New Jersey State AFL-CIO, Sandra P.
Cohen, Michael A. Justiniano, Diane Cameron,
and Donna Chiera; Zazzali, Fagella, Nowak,
Kleinbaum & Friedman, attorneys for New
Jersey Education Association, New Jersey
State Policemen's Benevolent Association,
Inc., American Federation of State, County,
and Municipal Employees, Council 1, AFL-CIO,
Christine Sampson-Clark, Heidi Olsen,
Patricia Provnick, Keith Dunn, Patrick
Colligan, Marc Kovar, and Lance P. Lopez,
Sr.; Mets Schiro & McGovern, attorneys for
Professional Firefighters Association of New
Jersey, IAFF, AFL-CIO, American Federation

of Teachers New Jersey Federation, AFL-CIO,
and Dominick Marino; Markowitz and Richman,
attorneys for New Jersey Fraternal Order of
Police and Russell Leak; Oxfeld Cohen,
attorneys for International Federation of
Professional and Technical Engineers, AFL-
CIO & CLC, and Local 195; Craig S. Gumpel,
attorney for New Jersey State Firefighters'
Mutual Benevolent Association, Edwin
Donnelly, Tim Deutsch, Kyle Hughes, and John
E. Murphy, Jr.; Robert M. Schwartz, attorney
for New Jersey Principals and Supervisors
Association, Janet S. Zymroz, John C.
Alfieri, Jr., Hope Grant, and Rosario
Capaccio; and Fox & Fox, attorneys for
Probation Association of New Jersey,
Professional Case-Related Unit, Probation
Association of New Jersey, Professional
Supervisors Union, Dwight Covaleski, Gavin
Cummins, and Ellen Cribbin; Mr. Weissman,
Mr. Nowak, Ira W. Mintz, Edward M. Suarez,
Jr., Adam M. Gordon, Justin Schwam, Flavio
L. Komuves, and Annmarie Pinarski, on the
brief).

Michael A. Bukosky argued the cause for
respondents Christopher Burgos, James
Kiernan, Stephen Sternik, State Troopers
Fraternal Association of New Jersey, State
Troopers Non-Commissioned Officers
Association of New Jersey, Inc., and State
Troopers Superior Officers Association of
New Jersey (Loccke, Correia & Bukosky,
attorneys; Mr. Bukosky and Cory M. Sargeant,
on the brief).

Robert D. Klausner, a member of the Florida
bar, argued the cause for amici curiae
Boards of Trustees of the Retirement Systems
(Bennet D. Zurofsky, attorney; Mr. Klausner
and Mr. Zurofsky, on the brief).

Leon J. Sokol argued the cause for amici
curiae Senate President Stephen M. Sweeney
and General Assembly Speaker Vincent Prieto
(Sokol Behot, attorneys; Mr. Sokol and Scott
E. Rekant, on the brief).

5

James Katz submitted a brief on behalf of amicus curiae New Jersey Citizen Action (Spear Wilderman, attorneys).

JUSTICE LaVECCHIA delivered the opinion of the Court.

In 1997, with enactment of Chapter 113 of the Laws of New Jersey, the Legislature granted to members of the public pension funds a "non-forfeitable right to receive benefits," a right defined to mean that benefits could not be reduced once the right to them had attached. See N.J.S.A. 43:3C-9.5(a)-(b). The individual members of the public pension systems, by their public service, earned this delayed part of their compensation. See ibid. That those men and women must be paid their pension benefits when due is not in question in this matter.

In 2011, with enactment of Chapter 78, L. 2011, c. 78, the Legislature amended N.J.S.A. 43:3C-9.5(c). Chapter 78's amendment to subsection (c) introduced contractual terms in connection with the State's payment of its annual required contribution to the various pension funds. The contractual terminology creates an expectation that the State would contribute timely, annually scheduled, required payments to the pension funds, thereby addressing the alarming current unfunded accrued liability and restoring the various funds to fiscally sound levels.

Plaintiffs brought this action because the prior Fiscal Year (FY) 2014 and current FY 2015 Appropriations Acts did not provide sufficient funding to meet the amounts called for under Chapter 78's payment schedule. Plaintiffs argue that Chapter 78 created an enforceable contract that is entitled to constitutional protection against impairment. Notwithstanding the State's willing participation in Chapter 78's enactment, it argues that the budgetary and debt limiting clauses of the State Constitution conflict with any binding agreement created by Chapter 78's language. We granted the State's motion for direct certification to resolve the important questions raised by this apparent clash of constitutional provisions.

Although plaintiffs correctly assert that a promise was made by the legislative and executive branches when enacting Chapter 78, and morally their argument is unassailable, we conclude that Chapter 78 could not create the type of legally enforceable contract that plaintiffs argue, and the trial court found, is entitled to protection under the Contracts Clauses of either the State or Federal Constitutions. The Debt Limitation Clause of the State Constitution interdicts the creation, in this manner, of a legally binding enforceable contract compelling multi-year financial payments in the sizable amounts called for by Chapter 78.

7

No matter how well-intentioned the government actors and no matter how worthy the cause to be advanced by Chapter 78, the Debt Limitation Clause speaks directly to this situation and, in pertinent part, commands:

> The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. . . . [N]o such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.
>
> [N.J. Const. art. VIII, § 2, ¶ 3.]

The purpose to be achieved by the Debt Limitation Clause dovetails with the Framers' intent for a fiscally responsible annual budget process. Efforts to dedicate monies through legislative acts other than the annual appropriations act have no binding effect. They are read as impliedly suspended when contradicted by the budgetary judgment of the presently constituted Legislature acting in concert with the Governor in their constitutionally prescribed budget formation roles. Those debt limitation and appropriations-related constitutional clauses conflict with the contractual language of Chapter 78 and thwart plaintiffs' impairment claims.

8

We therefore hold that the Legislature and Governor were without authority to enact an enforceable and legally binding long-term financial agreement through this statute.  Chapter 78's contractual language creates, at best, the equivalent of appropriations-backed debt that is accompanied by a strong legislative expression of intent to provide future funding.  The legislative use of contractual terms in Chapter 78, when referring to the required schedule of recurring payments of the State's annual required contribution to the State public pension systems, does not create an enforceable long-term financial contract that can co-exist with the limitations of the Debt Limitation Clause and the related Appropriations Clause of the State Constitution.  So long as Chapter 78 exists in its present statutory form, each year's appropriations act will reflect the present legislative and executive judgment as to the budgetary priority of this pressing need for which those branches will be answerable to the public and to the financial marketplace.  It is not the place of this Court to dictate that judgment, for the Constitution has left such budgetary and political questions to the other two branches.

I.

A.

The Division of Pensions and Benefits, part of the Department of the Treasury, administers the State public pension

9

systems.  They include the Police and Firemen's Retirement System, N.J.S.A. 43:16A-1 to -68; the Public Employees' Retirement System, N.J.S.A. 43:15A-1 to -161; the Teachers' Pension and Annuity Fund, N.J.S.A. 18A:66-1 to -93; the State Police Retirement System, N.J.S.A. 53:5A-1 to -47; the Consolidated Police and Firemen's Pension Fund, N.J.S.A. 43:16-1 to -21; the Judicial Retirement System, N.J.S.A. 43:6A-1 to -47; and the Prison Officers' Pension Fund, N.J.S.A. 43:7-7 to -27. For background purposes, those systems are defined-benefit plans, which guarantee participants a discernible amount of benefits to be paid upon retirement based on the particular participant's salary and time spent in the pension system.

The benefits are paid using revenues received from employee contributions, public employer (i.e., State) contributions, and investment returns.  Under the amendments to the statutes governing the State's pension systems that lie at the heart of this matter, the Legislature has required the State to make a full annually required contribution (ARC) to the pension systems.  The ARC equals the sum of the statutorily required annual normal contribution (ANC) and the annual unfunded accrued actuarial liability contribution (UAAL).

The ANC represents the present value of the actual benefits that active pension members earned in the current year.  It is the actuarially calculated amount necessary to fund the pension

benefits accrued in and for that year of service by active participants in the State pension systems.

The UAAL represents the necessary payment required to amortize the systems' unfunded liability over a specified period of years.  The unfunded liability is the excess of the systems' actuarial liability above the actuarial value of the systems' assets on hand.  The actuarial liability represents what it would cost to pay pension benefits to active and retired employees for the duration of their retirement.  Thus, the UAAL payments constitute planned amounts that will amortize the actuarially calculated sum of monies that represents the gap between the pension systems' actuarial value of assets and the present value of all current actuarial liabilities as to both active and retired members.

On June 28, 2011, the New Jersey Legislature enacted Chapter 78, section 26 of which amended N.J.S.A. 43:3C-9.5(c), addressing the responsibility of State employers to contribute to the above-mentioned pension systems.  Prior to the amendment, subsection (c) of the statute provided:

> The State shall make an annual normal contribution and an annual unfunded accrued liability contribution to each system or fund pursuant to standard actuarial practices authorized by law, unless both of the following conditions are met: (1) there is no existing unfunded accrued liability contribution due to the system or fund at the close of the valuation period applicable to

11

the upcoming fiscal year; and (2) there are excess valuation assets in excess of the actuarial accrued liability of the system or fund at the close of the valuation period applicable to the upcoming fiscal year.

[L. 1997, c. 113, § 5.]

Chapter 78 substantially changed N.J.S.A. 43:3C-9.5(c). The State remains required to make ANC and UAAL payments subject to the exceptions outlined in the above pre-amendment language, but Chapter 78 added important language that is the subject of this matter. N.J.S.A. 43:3C-9.5(c) now reads, in relevant part:

> (1) The State and all other applicable employers shall make their annual normal contribution to each system or fund . . . . The State and all other applicable employers shall also make their annual unfunded accrued liability contribution . . . . The annual normal contribution plus the annual unfunded accrued liability contribution shall together be the annual required contribution, provided, however, that for the State, [N.J.S.A. 43:3C-14] shall apply with regard to the State's annual required contribution. The amount of the State's annually required contributions shall be included in all annual appropriations acts as a dedicated line item.
>
> (2) Each member of the [State's pension systems] . . . shall have a contractual right to the annual required contribution amount being made by the member's employer or by any other public entity. The contractual right to the annual required contribution means that the employer or other public entity shall make the annual required contribution on a timely basis . . . . The failure of the State or any other public employer to make the annually required contribution shall be deemed to be an impairment of the contractual right of each employee. . . .

12

[L. 2011, c. 78, § 26 (codified at N.J.S.A. 43:3C-9.5(c)) (emphasis added).]

N.J.S.A. 43:3C-14, referred to in subsection (c)(1) above, required the State, "[c]ommencing July 1, 2011," to make its contribution "in full each year to each system or fund in the manner and at the time provided by law." That section, enacted previously on March 22, 2010, as Chapter 1 of the Laws of 2010, did not require the State to begin paying 100 percent of its required ANC and UAAL contributions (i.e., the ARC) immediately on July 1, 2011. Instead, Chapter 1 provided for an incremental rise in the payments the State was required to make to the pension funds:

> The State with regard to its obligations funded through the annual appropriations act shall be in compliance with this requirement provided the State makes a payment, to each State-administered retirement system or fund, of at least 1/7th of the full contribution, as computed by the actuaries, in the State fiscal year commencing July 1, 2011 and a payment in each subsequent fiscal year that increases by at least an additional 1/7th until payment of the full contribution is made in the seventh fiscal year and thereafter.

> [N.J.S.A. 43:3C-14.]

Specifically, beginning with FY 2012, the State would be in compliance by contributing at least 1/7th of the ARC contribution in that fiscal year, and in ensuing years, 2/7ths of the ARC in FY13, 3/7ths in FY14, 4/7ths in FY15, 5/7ths in

FY16, 6/7ths in FY17, and a full payment in FY18. See N.J.S.A. 43:3C-14. Thus, for example, although the full ARC payment for FY15 amounted to $3.937 billion, Chapter 1 required the State only to contribute $2.25 billion, which is 4/7ths of the full ARC payment.

In combination, Chapter 78 and Chapter 1 require the State to contribute the entire ARC amount owed to pension systems every year by dedicating that amount as a line item in each year's appropriations act. Importantly, Chapter 78 added language explicitly declaring the existence of a contractual right in pension-system members and setting forth that State employers' failure to comply with the full-contribution requirement is "deemed to be an impairment" of that right as to each member that either members or the trustees of the Funds themselves could enforce.

B.

The State made its required contributions in FY12 and FY13.

On June 30, 2013, the Governor signed into law the FY14 Appropriations Act, which included an appropriation for the State's full required contribution (3/7ths of its ARC) for that fiscal year.

Thereafter, in February 2014, Governor Christie released the FY15 proposed budget, which also included $2.25 billion to satisfy the State's required 4/7ths ARC payment.

However, on May 20, 2014, the Governor issued Executive Order 156, which reduced State payments into the pension systems for FY14, explaining that said action was due to a severe and unanticipated revenue shortfall. The required 3/7ths ARC contribution totaled $1.582 billion for FY14, which represented the sum of a $298 million ANC and a $1.284 billion UAAL. Instead of paying that amount, the State made a total FY14 contribution of $696 million, which is explained as representing a 7/7ths payment of the FY14 ANC calculation and 0/7ths payment of the required FY14 UAAL calculation.

The next day, the State Treasurer announced that the proposed budget for FY15 was being revised to reduce the amount that would be contributed to pension systems. The Treasurer cited new information that placed the State's projected revenue for FY15 at about $1.7 billion less than previous projections. The revised FY15 budget thus advanced would include a total ARC contribution of $681 million, reflecting $1.57 billion less than the State's required ARC contribution.

In response, plaintiffs -- individuals and unions acting on behalf of hundreds of thousands of New Jersey State public employees[1] -- filed complaints alleging statutory violations,

---

[1] Plaintiffs consist principally of Christopher Burgos, James Kiernan, Stephen Sternik, State Troopers Fraternal Association of New Jersey, State Troopers Non-Commissioned Officers Association of New Jersey, and State Troopers Superior Officers

impairment of contractual rights under the New Jersey and United States Constitutions, violations of substantive and procedural due process under both Constitutions, a violation of plaintiffs' Equal Protection rights, promissory estoppel, and violations of the New Jersey Civil Rights Act. Plaintiffs sought injunctive and mandamus relief for both FY14 and FY15. The trial court consolidated plaintiffs' claims against defendants into one action.

With respect to the budgetary action involving the then-imminently concluding FY14, the Law Division upheld the Governor's determination not to make the required FY14 ARC payment, declaring the action lawfully within the Executive's emergency powers and reasonable and necessary under the Contracts Clauses of the New Jersey and United States Constitutions. The court held that plaintiffs' claims for FY15 were not ripe because the Legislature had not yet passed a FY15 Appropriations Bill, but that plaintiffs were free to challenge the FY15 bill once the Legislature passed it.

Association of New Jersey, as well as Communications Workers of America, New Jersey Education Association, New Jersey Fraternal Order of Police, Professional Firefighters Association of New Jersey, International Federation of Professional and Technical Engineers, New Jersey State Firefighters, and Probation Association of New Jersey.

16

When the Legislature passed its FY15 Appropriations Bill on June 26, 2014, the bill included a $2.25 billion appropriation (the full 4/7ths required ARC).  The FY15 Appropriations Bill that the Legislature sent to the Governor was financed in part by companion bills establishing new taxes whose projected revenue streams were incorporated into the Legislature's anticipated revenue for FY15.[2]

On June 30, 2014, Governor Christie exercised his line-item veto authority in respect of the Legislature's passed FY15 Appropriations Bill, deleting, among other budgetary items, $1.57 billion of the State's required pension payment from the approved parts of the FY15 Appropriations Act.  In his line-item veto message, Governor Christie stated that he opposed raising taxes to pay for the budget deficit, eliminated the new revenues projected for new taxes as presented by the Legislature, and cited his constitutional responsibility to deliver a balanced budget as the reason for reducing the State's FY15 contribution. Subsequently, on July 11, 2014, the Governor issued absolute vetoes on the separate companion bills that had established the

---

[2] Specifically, the Legislature passed bills establishing new taxes colloquially referred to as a "corporate business tax surcharge" and a "millionaire's tax."  Assemb. 3484, 216th Leg. (June 26, 2014); Assemb. 3485, 216th Leg. (June 26, 2014).

new tax revenue that the Legislature had included in its FY15 Appropriations Bill.

The Legislature did not take action to override the line-item veto.  Therefore, the 2015 Appropriations Act became law, subject to the line-item veto changes.  Under the FY15 Appropriations Act, the State will make in the course of FY15 a $681 million pension contribution, an amount that is represented to constitute 7/7ths of the FY15 ANC and 0/7ths of the UAAL calculation.

Plaintiffs filed amended complaints in the Law Division.  The State responded by filing a motion to dismiss, and plaintiffs, in turn, filed a motion for summary judgment.  Plaintiffs argued that, in enacting Chapter 78, the State undertook a contractual obligation to make the ARC payment to the pension system and that the State's failure to make the full FY15 ARC payment constituted an impairment of that contract in violation of the Contracts Clauses of the State and Federal Constitutions.  According to plaintiffs, the contractual right contained in Chapter 78 did not implicate the Debt Limitation Clause, did not violate the Appropriations Clause, and could not be abrogated by the Governor's exercise of his line-item veto power.  Plaintiffs' prayer for relief requested that the court require the Legislature and the executive branch to adopt an

18

appropriations act consistent with the contractual obligations outlined in Chapter 78.

In its motion to dismiss and in opposition to plaintiffs' motion for summary judgment, the State asserted that Chapter 78 could not create a valid contract right because it violated the Appropriations and Debt Limitation Clauses and the line-item veto provision of the New Jersey Constitution. Even assuming, but not conceding, that an enforceable contract right was created, the State maintained that it did not substantially impair that contract right because (1) plaintiffs were not without remedy in the form of a breach of contract action and (2) the non-payment of the 4/7ths UAAL did not materially impact the health of the pension systems or result in the non-payment of benefits to retirees. Further, again assuming but not conceding that substantial impairment occurred, the State submitted that its decision was reasonable and served a legitimate public purpose. The State also raised arguments based on sovereign immunity and the non-justiciability of political questions.

On February 23, 2015, the trial court issued a detailed and comprehensive opinion that granted summary judgment to plaintiffs on their impairment-of-contract claims, granted plaintiffs' application for declaratory judgment, and denied defendants' motion to dismiss plaintiffs' claims. The trial

19

court accepted plaintiffs' argument that Chapter 78 created a contract and that the State's failure to appropriate the full value of the ARC in the FY15 Appropriations Act substantially impaired plaintiffs' rights under that contract. Thus, the court concluded that plaintiffs stated cognizable claims under both the Federal and State Contracts Clauses. In so finding, the court rejected arguments that Chapter 78 was unenforceable as violative of the Debt Limitation Clause, the Appropriations Clause, and the gubernatorial line-item veto power. The court did not order a specific appropriation. Instead, the court determined "to give the other branches an opportunity to act in accordance with the court's decree." The trial court declined to reach the remainder of plaintiffs' claims.

On March 13, 2015, the State filed a motion for leave to appeal to the Appellate Division. Shortly thereafter, the State filed a motion seeking direct certification to the Court. The motion was unopposed. On April 6, 2015, this Court issued an order granting direct certification, establishing a briefing schedule, and setting the matter down for oral argument on May 6, 2015. This Court subsequently granted New Jersey Citizen Action's motion to appear as amicus curiae, as well as the motion of Senate President Stephen M. Sweeney and General Assembly Speaker Vincent Prieto to participate as amicus curiae. The New Jersey Retirement System Boards of Trustees also

20

participate as amici curiae pursuant to the trial court's November 2014 order granting them such status.

II.

A.

The parties' arguments before this Court are refined versions of their arguments before the trial court. We address them as part of our substantive analysis of the instant controversy.

That said, no analysis of this matter fairly can commence without initially recognizing the promises made on the State's part toward meeting the scheduled payments to reduce the unfunded liability. Plaintiffs and amici highlight those promises. They emphasize the many statements -- statements made as part of the legislative process and to the public before and after Chapter 78 was enacted -- praising the bipartisan legislative endeavor and referring to the legislative achievement as a contract.

Most certainly, a litany of public statements indicate State officials' satisfaction in respect of Chapter 78's passage. A 2011 joint statement from the Governor and the leaders of the various legislative factions declared that "[t]he legislation [(i.e., Chapter 78)] . . . saves the public pension system for current and future retirees . . . . We all fully support this legislation and will work together to assure its

21

passage by both houses of the Legislature and enactment into law . . . ." Press Release, Office of the Governor, Statement from Governor Chris Christie, Senate President Stephen Sweeney, Assembly Speaker Sheila Oliver, Senate Minority Leader Thomas Kean, Jr. and Assembly Minority Leader Alex DeCroce (June 15, 2011), available at http://www.state.nj.us/governor/news/news/552011/approved/20110615c.html. Chapter 78 was called "bold" and the product of "cooperation, bipartisanship and compromise." Press Release, Office of the Governor, Governor Christie Signs into Law Bold, Bipartisan Pension and Health Benefits Reform (June 28, 2011), available at http://www.state.nj.us/governor/news/news/552011/approved/2011062 8B.html.

Likewise, there is no question that the participants in the legislative process referred to Chapter 78 as creating a contract. See NJ Citizen Action Joins Pension Lawsuit, Politicker NJ (Apr. 28, 2015), http://politickernj.com/2015/04/nj-citizen-action-joins-pension-lawsuit/ (quoting Governor's remarks at 2011 appearance: "Th[e pension payment] schedule is codified into the legislation we have right now and makes it a contractual right of the folks in the pension system to have those payments made."); Mark J. Magyar, Sweeney Urges Pension Funding Overhaul to Reduce Impact

22

on State Budget, NJ Spotlight (Oct. 28, 2014), http://www.njspotlight.com/stories/14/10/28/sweeney-urges-pension-funding-overhaul-to-save-nj-s-troubled-plagued-system/ (noting legislative leader's assertion that Chapter 78's language expresses clear legislative intent to create contractual obligation).

We do not question the good intentions of those participating in the enactment of Chapter 78 or that they intended to create a contractual arrangement that addressed future payments into the funds of the several public pension systems to promote the fiscal health of those funds. But a strictly legal question is now before us. That, and that alone, is what must be resolved in this matter of great public importance to members of the public pension systems and citizens throughout the State.

### B.

Both the New Jersey and Federal Constitutions prohibit the passage of laws impairing the obligation of contracts. U.S. Const. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."); N.J. Const. art. IV, § 7, ¶ 3 ("The Legislature shall not pass any . . . law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made."). This Court has recognized that the

23

Federal and State Contracts Clauses provide "'parallel guarantees.'" Fid. Union Trust Co. v. N.J. Highway Auth., 85 N.J. 277, 299 (1981) (quoting P. T. & L. Constr. Co. v. Comm'r, 60 N.J. 308, 313 (1972)); see also In re Pub. Serv. Elec. & Gas Co.'s Rate Unbundling, 330 N.J. Super. 65, 92 (App. Div. 2000) (noting coextensive protection provided under both clauses), aff'd o.b., 167 N.J. 377, 382, 395, cert. denied, 534 U.S. 813, 122 S. Ct. 37, 151 L. Ed. 2d 11 (2001).

"Legislation unconstitutionally impairs a contract when it (1) 'substantially impair[s] a contractual relationship,' (2) 'lack[s] a significant and legitimate public purpose,' and (3) is 'based upon unreasonable conditions and . . . unrelated to appropriate governmental objectives.'" Farmers Mut. Fire Ins. Co. of Salem v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 546-47 (2013) (alterations in original) (quoting State Farm Mut. Auto. Ins. Co. v. State, 124 N.J. 32, 64 (1991)); see also U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 25, 97 S. Ct. 1505, 1519, 52 L. Ed. 2d 92, 112 (1977) ("[A]n impairment may be constitutional if it is reasonable and necessary to serve an important public purpose.").

Under the Contracts Clause of either the State or Federal Constitution, the premise for performing a contract impairment analysis is the existence of a valid enforceable contract under state law. Thus, the first step in the substantial impairment

24

analysis is, necessarily, to determine "'whether there is a contractual relationship.'" N.J. Educ. Ass'n v. State (NJEA), 412 N.J. Super. 192, 205 (App. Div.) (quoting Gen. Motors Corp. v. Romein, 503 U.S. 181, 186, 112 S. Ct. 1105, 1109, 117 L. Ed. 2d 328, 337 (1992)), certif. denied, 202 N.J. 347 (2010). When a contractual relationship is purportedly created through a statute's enactment, two questions may be distilled and must be addressed in analyzing whether a contract was successfully formed:

(1) did the Legislature speak with sufficient clarity to evince intent to create a contract right, see, e.g., San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys., 568 F.3d 725, 737 (9th Cir. 2009) (stating that in Contracts Clause analysis, state statutes "must evince a clear and unmistakable indication" of legislature's intent to form contractual relationship before they may be read to create contract); Parker v. Wakelin, 123 F.3d 1, 5 (1st Cir. 1997) (requiring "a clear indication that the legislature intends to bind itself in a contractual manner" to create contract rights); and

(2) did state law grant to the Legislature the authority to enter into the binding and enforceable contract in question, see, e.g., Indiana ex rel. Anderson v. Brand,

25

303 U.S. 95, 100, 58 S. Ct. 443, 446, 82 L. Ed. 685, 691 (1938) (explaining that in Federal Contracts Clause claims court must evaluate validity of contract under state law); San Diego Police Officers' Ass'n, supra, 568 F.3d at 737 (explaining that in Federal Contracts Clause claims "federal courts look to state law to determine the existence of a contract" before using federal principles in conducting Contracts Clause analysis).

C.

On the question of clarity of expression to exhibit sufficient intent to create a contract, the United States Supreme Court has instructed courts adjudicating Federal Contracts Clause claims not to presume that a statute creates private contract rights unless "some clear indication" establishes the intent to do so. Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co., 470 U.S. 451, 465-66, 105 S. Ct. 1441, 1451, 84 L. Ed. 2d 432, 446 (1985). Our state jurisprudence reflects that federal law requirement.

In Spina v. Consolidated Police & Firemen's Pension Fund Commission, 41 N.J. 391, 405 (1964), on which plaintiffs rely, this Court said that a statute may be construed as creating a contract when the Legislature's intent to create a contractual commitment is "so plainly expressed that one cannot doubt the individual legislator understood and intended it." Similarly,

26

in NJEA, supra, the Appellate Division recognized that clarity of language is necessary if a statute is to be regarded as having been intended to create contractual rights "because the effect of such authorization is to surrender the fundamental legislative prerogative of statutory revision and amendment and to restrict the legislative authority of succeeding legislatures." 412 N.J. Super. at 206-07 (citations omitted).

Here the Legislature certainly spoke with clarity and used terminology that plainly expressed its intent to create contractual rights. Chapter 78 expressly references a "contractual right" to the method of ARC payment three times, and the statute denotes the State's failure to make the ARC payment an "impairment," which invokes the language of the State and Federal Constitutions' Contracts Clauses. See U.S. Const. art. I, § 10, cl. 1; N.J. Const. art. IV, § 7, ¶ 3; N.J.S.A. 43:3C-9.5(c)(2). Such language markedly contrasts with that of other pension statutes that New Jersey courts previously have determined did not create a contract with attendant contractual rights. See, e.g., Spina, supra, 41 N.J. at 399 ("'[T]he common council or other governing body shall include in any tax levy a sum sufficient to meet the requirements of said fund . . . .'" (emphasis added) (quoting L. 1920, c. 160)); NJEA, supra, 412 N.J. Super. at 199 ("'[T]he Legislature shall make an appropriation sufficient to provide for the obligations of the

27

State' . . . ." (emphasis added) (quoting N.J.S.A. 18A:66-33)). Where the statutory language in Spina and NJEA was implicit, at most, in expressing any intention to contractually commit either municipalities in Spina or the State in NJEA to a payment obligation, Chapter 78's repetitious use of the phrase "contractual right" and inclusion of the word "impairment" to describe the State's failure to perform its payment obligation plainly expresses legislative intent to create a contract right. See Spina, supra, 41 N.J. at 405.

We conclude that the Legislature and Governor clearly expressed an intent that Chapter 78 create a "contract right" to timely and recurring ARC payments to reduce the unfunded liability of the pension funds to safe levels. But, that conclusion does not address the question of authority to do so.[3]

The essential question that must be answered is whether legislative authority could be exercised through Chapter 78 to create a legally binding, enforceable contract compelling future

---

[3] Although Spina recognized that the Legislature can create a contract through clear language, that case dealt with a statute purporting to bind municipalities. Spina, supra, 41 N.J. at 395, 399. Municipalities are not subject to the Debt Limitation and Appropriations Clauses, and so Spina does not address the issue at the heart of this case: the State's authority to form the clearly intended contract in Chapter 78 in light of those constitutional provisions. Therefore, Spina is not of further assistance beyond the threshold principle that the Legislature must speak with clarity to form a contract through legislative enactment.

State appropriations to pay down the unfunded liability.[4]

Indeed, although the Legislature clearly may express its intent to contract, that body's actions must comport with the Constitution. See, e.g., U.S. Trust Co., supra, 431 U.S. at 23, 97 S. Ct. at 1518, 52 L. Ed. 2d at 110 (noting reserved-powers doctrine limits State's authority to enter into contract relinquishing "an essential attribute of its sovereignty"); Gen. Assembly v. Byrne, 90 N.J. 376, 391 (1982) ("The Legislature cannot pass an act that allows it to violate the Constitution.").

In making that determination, it is generally recognized that state law governs the existence of a valid contract, even for impairment claims under the Federal Contracts Clause. See, e.g., Brand, supra, 303 U.S. at 100-09, 58 S. Ct. at 446-50, 82 L. Ed. at 690-95 (applying Indiana law to determine "existence

---

[4] Entirely distinct from this question is the issue addressed in the recent decision of the Supreme Court of Illinois. Heaton v. Quinn (In re Pension Reform Litig.), ___ N.E.2d ___ (Ill. 2015) (slip op. at 19). In that case, the court addressed the reduction of benefits in violation of the state constitution's pension protection clause, which provides: "Membership in any pension or retirement system of the State . . . shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. art XIII, § 5; Heaton, supra, ___ N.E.2d at ___ (slip op. at 2-3). The Illinois lawmakers clearly created a substantive constitutional right to benefits that could not be diminished, and diminution in benefits was the issue before the court, Heaton, supra, ___ N.E.2d at ___ (slip op. at 19). The Illinois Supreme Court was not addressing a purported right to a specific funding scheme.

and nature" of contract); <u>Appleby v. City of New York</u>, 271 <u>U.S.</u> 364, 380, 46 <u>S. Ct.</u> 569, 573, 70 <u>L. Ed.</u> 992, 999 (1926) (explaining that "construction and effect" of contract was to be determined from "the law of the state"); <u>Tron v. Condello</u>, 427 <u>F. Supp.</u> 1175, 1186 (S.D.N.Y. 1976) ("[W]e must look to the law of New York at the time plaintiff's alleged contractual rights were created to see exactly what provisions are protected against impairment."). We therefore turn to New Jersey law that pertains to the legal enforceability of the purported statutory contractual right to Chapter 78's required annual pension payments.

III.

A.

The Debt Limitation Clause of the New Jersey Constitution, in full, provides:

> The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law

30

shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. Except as hereinafter provided, no such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon.

[N.J. Const. art. VIII, § 2, ¶ 3.]

It is unnecessary to recount yet again the historical origins of the Debt Limitation Clause. That has been done, well and thoroughly, numerous times before, most recently by this Court in Lonegan v. State (Lonegan I), 174 N.J. 435, 443-45, 464 (2002). See also, e.g., Lonegan v. State (Lonegan II), 176 N.J. 2, 14 (2003) ("The Debt Limitation Clause was adopted in 1844 because of concerns about binding obligations imposed on future generations of taxpayers and because of unchecked speculation by the state."); Clayton v. Kervick, 52 N.J. 138, 146-47 (1968) (discussing historical context of Debt Limitation Clause's adoption); McCutcheon v. State Bldg. Auth., 13 N.J. 46, 67-68 (1953) (Jacobs, J., dissenting) (same), overruled by Enourato v. N.J. Bldg. Auth., 90 N.J. 396, 410 (1982). Those cases indicate that in drafting the Debt Limitation Clause, the Framers intended to empower the people of the State by giving them the final word in respect of creating financial commitments that might impair the State's fiscal health and have inter-generational repercussions. See Lonegan I, supra, 174 N.J. at 464 ("The framers believed that future generations of taxpayers

31

should not have to pay for their generation's mistakes."); Spadoro v. Whitman, 150 N.J. 2, 12-13 (1997) (Handler, J., concurring in part and dissenting in part) (explaining that Debt Limitation Clause serves the "broad and fundamentally important purpose of not binding future majorities to the financial policies of current majorities").

Similarly, on several occasions this Court has canvassed the development of its Debt Limitation Clause jurisprudence and, again, Lonegan I, supra, represents the most recent of those discussions. 174 N.J. at 445-52; see also, e.g., id. at 475-93 (Stein, J., concurring in part and dissenting in part) (discussing in detail Debt Limitation Clause jurisprudence); In re Loans of N.J. Prop. Liab. Ins. Guar. Ass'n, 124 N.J. 69, 75-77 (1991) (recounting this Court's cases involving Debt Limitation Clause). The decisions in Lonegan I and Lonegan II distilled the animating principle applied throughout those decisions: the State cannot by contract or statute create a binding and legally enforceable financial obligation above a certain amount that applies year to year without voter approval. See Lonegan II, supra, 176 N.J. at 13-14; Lonegan I, supra, 174 N.J. at 462-63. Such long-term financial arrangements require voter approval to be enforced; or, such financial promises otherwise avoid the Debt Limitation Clause's interdiction by being regarded as expressions of intent to provide the funding,

32

but they must be subjected to the annual appropriation process for fulfillment in whole, in part, or not at all. See Lonegan II, supra, 176 N.J. at 14-15 ("When contract or appropriations-backed debt is issued, . . . the State does not pledge its full faith and credit and is not legally bound to make payment on that debt."); Lonegan I, supra, 174 N.J. at 462-63.

In Lonegan II, supra, this Court confronted "a broad challenge to the validity of fourteen New Jersey statutes authorizing contract or appropriations-backed debt." 176 N.J. at 4. The plaintiffs argued that the "subject to appropriation" qualification contained in the statutes authorizing financial obligations was meaningless because the State's failure to appropriate funds to make the particular bond payments would negatively affect the State's credit and access to financial markets; thus, according to the plaintiffs, appropriations-backed financial obligations were effectively "full faith and credit bonds" requiring voter approval to pass muster under the Debt Limitation Clause. See id. at 10-11.

This Court rejected the plaintiffs' challenge, noting that, "[u]nder our case law, only debt that is legally enforceable against the State is subject to the Debt Limitation Clause." Id. at 13. The Court continued: "By its terms, . . . the Clause as written requires voter approval only when the State is legally required to make payment on the debt it has incurred."

Id. at 14.  Therefore, the various statutory financing mechanisms at issue in Lonegan II did not violate the Debt Limitation Clause:  because payments on contract or appropriations-backed debt are necessarily left to the Legislature's discretion to appropriate, the State is not legally bound to make such payments.  See id. at 14-15 (citing Enourato, supra, 90 N.J. at 410; N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 14, appeal dismissed, 409 U.S. 943, 93 S. Ct. 270, 34 L. Ed. 2d 215 (1972)).

The Lonegan II Court recognized that, at the time the Debt Limitation Clause was adopted, "[t]he variety of financing mechanisms employed in both the private and the public sectors today were unheard of," id. at 14; indeed, "the variety of functions assumed by the government since the 1800s, and the sophisticated means now used to finance those functions, make it difficult if not impossible to differentiate among acceptable and unacceptable types of twenty-first century appropriations-backed debt under a nineteenth-century paradigm," id. at 15 (citations omitted).  The trial court in this matter interpreted that expression as exhibiting this Court's "willingness to find a contemporary, workable interpretation of the Clause to accommodate fiscal realities in the [twenty-first] century," and as evidencing the Court's "flexible approach" when confronted with legislation implicating the strictures of the Clause.  The

34

trial court determined that that flexibility allowed Chapter 78 to bind the State in the manner intended by the Legislature.

However, the trial court based its Debt Limitation Clause analysis on a fundamental misperception of the flexibility that was discussed in Lonegan II.  In Lonegan II, we recognized flexibility in the manner in which financing is structured, noting that many types of financing used today were not in use in 1844 (i.e., sale and leaseback agreements).  See id. at 14-15.  The Lonegan II decision acknowledged the need for flexibility in modern financing, and adjusted for same in the performance of a Debt Limitation Clause analysis by reducing the prohibited conduct to an easily understood principle:  so long as the State's full faith and credit is not pledged and a legally enforceable financial obligation, above a certain amount and lasting year to year, is not created, without voter approval, no Debt Limitation Clause violation ensues.  See id. at 13-15.  As applied in the circumstances presented in Lonegan II, if a financial obligation is made dependent on securing an appropriation from year to year, then parties are apprised of the element of risk and no constitutional debt limitation violation arises.  What matters is not what the financing scheme is called, but rather how it operates.

Lonegan II thus requires a court confronted with a Debt Limitation Clause issue to drill down to determine if a

35

purported debt or liability, created in any manner, establishes an impermissible legally enforceable obligation binding the State and compelling the appropriation of monies in future years.  The trial court's analysis in this matter found Lonegan II's reference to flexibility to encompass a permissive approach to modern financing methods tied only to the identified, evolving public good that the modern form of financing will serve.  That reading is inconsistent with Lonegan II's analysis and holding, as well as the jurisprudence it synthesized.  In sum, the atmosphere of flexibility that the Lonegan II analysis exudes cannot be divorced from the Debt Limitation Clause's stark directives, the Lonegan II Court's clear statements concerning the import of the Clause, or other of this Court's decisions assessing the Clause's restrictions.  See, e.g., Enourato, supra, 90 N.J. at 410 (noting Debt Limitation Clause not implicated where State not legally obligated to make appropriations); City of Camden v. Byrne, 82 N.J. 133, 152 (1980) ("The obligations created by the various statutes under which the several plaintiffs in this action claim entitlement, if directly enforceable as appropriations, would constitute debts incurred by the Legislature contrary to the terms and intent of the constitutional debt limitation clause."); City of Passaic v. Consol. Police & Firemen's Pension Fund Comm'n, 18 N.J. 137, 147 (1955) (holding legislation "provid[ing] that the

36

State _shall_ annually contribute" to pension fund did not create debt (emphasis added)).

To the extent plaintiffs argue that Chapter 78 does not implicate the Debt Limitation Clause, we pause to address the assertion that the Clause's language and intent is "to prevent the State from creating new debts or liabilities, not to prevent it from paying for overdue ordinary expenses," like Chapter 78's "payment plan," which does not include borrowing, principal, or interest, and is "contingent on the exact amount actually owed." In support, plaintiffs rely on cases that are cited as distinguishing between ordinary expenses of government and borrowing, specifically Bulman v. McCrane, 64 N.J. 105, 117-18 (1973), and minority views expressed by separately writing Justices as supporting the distinction we are asked to embrace. (Citing Spadoro, supra, 150 N.J. at 10-11; Lance v. McGreevey, 180 N.J. 590, 603 (2004); Lonegan v. State, 341 N.J. Super. 465, 487-88 (App. Div. 2001)). The trial court resorted to a "borrowing only" interpretation of the Debt Limitation Clause to conclude that the Clause's interdiction did not apply to the instant contractual language.

The approaches to the Debt Limitation Clause maintained by plaintiffs and utilized by the trial court are belied by the Clause's language and application in prior case law.

37

First, we need only look to the plain language of the Debt Limitation Clause to discern that its prohibition is broad. It is clearly written to have wide sweep, covering "debts" or "liabilities" created "in any manner," thereby reaching various forms of financial arrangements. The Framers underscored their broad intent through the inclusion of the "in any manner" language. Nothing about that language supports that traditional borrowing scenarios were the only intended prohibited transactions. That interpretation would render meaningless the "debt" or "liability" language, which has added dimension due to the inclusion of the "created in any manner" language. We do not support interpretations that render statutory language as surplusage or meaningless, and we certainly do not do so in the case of constitutional interdictions. See Innes v. Innes, 117 N.J. 496, 509 (1990) (noting "well-established canon[] of statutory interpretation" that "avoid[s] constructions that render any part of a statute inoperative, superfluous, or meaningless" (citations omitted)); Kervick v. Bontempo, 29 N.J. 469, 480 (1959) ("The Constitution was made to serve and protect the people of the State and all of its language must be sensibly construed with that uppermost in mind."); Gangemi v. Berry, 25 N.J. 1, 10 (1957) ("[I]t is to be presumed that the words employed have been carefully measured and weighed to convey a

38

certain and definite meaning, with as little as possible left to implication.").

Second, if only borrowing invoked the Clause's prohibition, this Court would not have engaged in Debt Limitation Clause analyses in prior decisions addressing settings that clearly did not involve traditional borrowing or debt instruments. Rather, many forms of promises to pay in statutory as well as in contractual settings that did not involve traditional borrowing have invoked Debt Limitation Clause analyses. See, e.g., Bulman, supra, 64 N.J. at 117-18 (holding long-term lease did not create present debt within meaning of Debt Limitation Clause because rent installments were subject to appropriation); City of Passaic, supra, 18 N.J. at 144, 147 (holding statutory requirement that State shall contribute annually to pension funds did not violate Debt Limitation Clause because "present legislation merely provides that the State shall annually contribute to the fund").

Those analyses were necessary because the Clause's animating principle is to prevent well-meaning state actors from presently binding the State to enforceable future financial obligations over a certain amount -- one percent of the annual appropriations act -- unless voter approval has been secured. Otherwise any such promises to pay must be subjected to the

appropriations process.[5]  That simple yet definite dividing line

between transactions that avoid a Debt Limitation Clause

transgression and those that do not is the common theme to the

Clause's jurisprudence.[6]  The Clause's plain language directs

voter approval for long-term liabilities or debt in excess of

---

[5] Thus, this Court's case law has found reason to conclude that the Debt Limitation Clause is not violated when the State indicates that it is not bound to expend state monies or has erected structural barriers through the use of independent agencies (or dedicated streams of non-General Fund revenue) that prevent the financial obligation from being enforceable and made an obligatory expenditure under the annual appropriations act. See, e.g., N.J. Sports & Exposition Auth., supra, 61 N.J. at 11 (statute empowering New Jersey Sports and Exposition Authority to issue bonds to finance construction of Meadowlands Complex provided that bonds issued were "under no circumstances debts of the State," and bonds themselves were required to carry statement that "the State . . . is [not] obligated to pay . . . [the bonds'] principal or interest and that neither the faith and credit nor the taxing power of the State . . . is pledged to the payment of the principal of or the interest on such bonds" (citation and internal quotation marks omitted)); N.J. Tpk. Auth. v. Parsons, 3 N.J. 235, 242 (1949) (legislation authorizing New Jersey Turnpike Authority to issue bonds to finance construction of Turnpike stated "bonds . . . shall be payable solely from . . . tolls and revenues of all or any part of the turnpike project . . . .").

[6] Because we find no ambiguity in the Debt Limitation Clause or in this Court's case law interpreting it, we find unpersuasive out-of-state case law interpreting the debt limitation clauses of other state constitutions to be limited to borrowing only, notwithstanding the trial court's use of such cases in reaching its conclusion. See, e.g., Village of Chefornak v. Hooper Bay Constr. Co., 758 P.2d 1266, 1270 (Alaska 1988); Rochlin v. State, 540 P.2d 643, 648 (Ariz. 1975); State ex rel. Wittler v. Yelle, 399 P.2d 319, 324-25 (Wash. 1965); Columbia Cnty. v. Bd. of Trs., 116 N.W.2d 142, 153 (Wis. 1962).

40

the Clause's threshold prohibitory amount.  Moreover, it established parameters for the incurring of any interest obligation and set a thirty-five year duration for full payment of any long-term obligation.

The Debt Limitation Clause's prohibition against the incurring of future debt or liability is vital and it is broad -- sufficiently broad to reach long-term financial obligations addressing so-called operating expenses.  Despite plaintiffs' argument to the contrary, the holding of Lance v. McGreevey, supra, 180 N.J. at 596-99, does not exempt "operating expenses" from the Clause's prohibition against entering into long-term binding and enforceable financing arrangements crossing fiscal years.  Lance stands for the proposition that long-term financial arrangements seeking to bind future Legislatures to make specific annual appropriations cannot be reconciled with the Constitution's commands in respect of legislative financing, even when those arrangements are proposed for the unorthodox purpose of funding "operating expenses" of government.  See ibid.  In short, neither the fact that Chapter 78 seeks to correct the failure of previous administrations to properly fund the pension systems nor plaintiffs' designation of the Chapter 78 funding mechanism as an "operating expense" of government remove Chapter 78 from the Debt Limitation Clause's purview.

41

Third, as this Court's decisions reflect, the Clause was intended by the Framers to play a coordinate role with the Appropriations Clause of the State Constitution. In combination, the Debt Limitation Clause and the Appropriations Clause of the New Jersey Constitution interdict the Legislature from creating a debt or liability, in any manner, in excess of a certain amount that binds the State to appropriate funds in future fiscal years. A consistent line of cases from our Court holds that the Appropriations Clause operates to render purported dedications of monies as line items in forthcoming appropriations acts as mere expressions of intent to pay. Thus, a "debt" or "liability" that is subject to appropriation through the annual appropriations process violates neither the Debt Limitation Clause nor the Appropriations Clause. Examination of our prior precedent reveals the case law's consistency on these subjects.

B.

The Appropriations Clause of the New Jersey Constitution mandates that:

> No money shall be drawn from the State treasury but for appropriations made by law. All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year; except that when a change in the fiscal year is made, necessary provision may

42

be made to effect the transition. No general appropriation law or other law appropriating money for any State purpose shall be enacted if the appropriation contained therein, together with all prior appropriations made for the same fiscal period, shall exceed the total amount of revenue on hand and anticipated which will be available to meet such appropriations during such fiscal period, as certified by the Governor.

[N.J. Const. art. VIII, § 2, ¶ 2.]

Under this Clause, the power and authority to appropriate funds is vested in the Legislature. See City of E. Orange v. Palmer, 52 N.J. 329, 337 (1968). The Clause has three requirements. One, all withdrawals of money from the State Treasury must be accomplished through legislative appropriation. Karcher v. Kean, 97 N.J. 483, 488 (1984). Two, the Legislature must provide for that appropriation "'in one general appropriation law covering one and the same fiscal year.'" Ibid. (quoting N.J. Const. art. VIII, § 2, ¶ 2). And three, the budget created by the appropriations law must be balanced; the State cannot "adopt[] an annual budget in which expenditures exceed revenues." Lance, supra, 180 N.J. at 596.

The legislative authority to appropriate is subject to a system of checks and balances. Karcher, supra, 97 N.J. at 489. The Governor is authorized by statute to "examine and consider all requests for appropriations" and to "formulate . . . budget recommendations" to submit to the Legislature. N.J.S.A. 52:27B-

43

20. More importantly, the Governor is constitutionally empowered to reject any item or items contained in an appropriations bill through the exercise of a selective veto (the line-item veto power). N.J. Const. art. V, § 1, ¶ 15. That veto may be overridden by a two-thirds vote of both the Senate and General Assembly. Ibid. When the Legislature does not reenact itemized appropriations by overriding the Governor's line-item vetoes, that action is regarded as intentional and advertent, and any earlier statutes purporting to appropriate future monies "must be deemed to be suspended by adoption of the later appropriation acts." City of Camden, supra, 82 N.J. at 154 (citations omitted).

The significance of the Appropriations Clause, and its related budgetary provisions, has long been recognized. "The constitutional requirement of a unitary general appropriations law . . . is the center beam of the state's fiscal structure." Karcher, supra, 97 N.J. at 488. The constitutional provision "was intended to eliminate uncoordinated spending on the state level and to overcome the inefficiency, confusion and abuses which had surrounded the practice of using separate and different budgets, appropriations, and fiscal years within State government." City of Camden, supra, 82 N.J. at 146-47 (citation omitted).

Equally, this Court has recognized the Judiciary's "absence of authority" for any role in the budgetary process. Karcher, supra, 97 N.J. at 490 (citations omitted); see also Fitzgerald v. Palmer, 47 N.J. 106, 108 (1966) (citing Appropriations Clause in holding that even if court imposed payment obligation on State, courts "could not enforce a judgment"). Because "the power and authority to appropriate funds lie solely and exclusively with the legislative branch of government," City of Camden, supra, 82 N.J. at 148 (citations omitted); see also Commc'ns Workers of Am. v. Florio, 130 N.J. 439, 451 (1992) (reaffirming Court's "commitment to that fundamental constitutional principle"), "[t]here can be no redress in the courts to overcome either the Legislature's action or refusal to take action pursuant to its constitutional power over state appropriations," City of Camden, supra, 82 N.J. at 149, 149-50 (citations omitted) (declining to find that statutes purporting to dedicate funds for local government uses constituted enforceable legislative appropriations); see also N.J. Div. of Youth & Family Servs. v. D.C., 118 N.J. 388, 399-400, 402 (1990) (following City of Camden in holding that Court could not order appropriation for payment to appointed counsel for indigent parents in termination-of-parental-rights actions, and adding specific rejection of argument that such power existed because

45

appointment scheme constituted taking without just compensation).

In City of Camden, supra, several municipalities and counties brought actions against State officials, arguing that certain State revenues should have been appropriated for their use as provided in various statutes. 82 N.J. at 141-45. However, the appropriations act for that fiscal year failed to include an appropriation of said funds. See ibid. This Court held that the Appropriations Clause "firmly interdicts the expenditure of state monies through separate statutes not otherwise related to or integrated with the general appropriation act governing the state budget for a given fiscal year." Id. at 146 (emphasis added). Therefore, the laws at issue (1) "d[id] not constitute legislative appropriations in and of themselves" but instead "purport[ed] to 'dedicate' state revenues for a particular purpose," (2) were not properly "included within a single appropriation law encompassing one fiscal year," and (3) could not "serve . . . as valid authority for the withdrawal of monies from the State treasury" under the Appropriations Clause. See id. at 145-47. Given the Legislature's "inherent power to disregard prior fiscal enactments," id. at 147, the Court held that it could not compel the Legislature to appropriate in accordance with those statutes, see id. at 150.

46

Further, the Court explained that to find otherwise -- to enforce the statutes as legislative appropriations -- would undermine the Appropriations Clause requirement that appropriations "be incorporated into a single balanced budget in which current expenditures must be met by current revenues." Id. at 151. Rather, the Appropriations Clause is intended to be "an effective barrier to any judicial or executive attempts to give independent effect as appropriations to miscellaneous statutes calling for the disbursement of state revenues." Ibid.

Moreover, the Court in City of Camden underscored that "[t]he constitutional fulcrum [wa]s not shifted by attempts to characterize the several statutes as creating 'substantive rights.'" Id. at 148. In fact, the Court noted that even if the statutes conferred substantive rights to the funds, it would "in no way diminish[] the Legislature's constitutional control over the state fisc." Ibid.; see also Lonegan II, supra, 176 N.J. at 18 (noting that State may enter into lease agreement but it "is not legally bound to make the rental payments and can opt not to do so"); Enourato, supra, 90 N.J. at 410 (noting that although New Jersey Building Authority Act "contemplates that the State will make the necessary appropriations [for contractual lease payments] . . . , the State is under no legal obligation to do so" (citation omitted)).

47

The analysis and holding in Enourato presents, perhaps, the paradigmatic example of the effect of the intersection of the Debt Limitation and Appropriations Clauses. In Enourato, supra, the Legislature enacted the New Jersey Building Authority Act (Act), which authorized the New Jersey Building Authority (Authority) to issue bonds to finance the construction and operation of State offices. 90 N.J. at 399. The Authority's bonds were to be repaid from rents received from State agencies that leased the Authority's facilities. Id. at 402. "In fact, the rental fees [we]re calculated to satisfy the Authority's obligations on its bonds and notes." Ibid. In addition to the bonds, which "state[d] on their face that they shall not create any indebtedness, liability or obligation of the State," id. at 399 (citation omitted), the Act declared that payment of rent to the Authority was "'subject to and dependent upon appropriations being made from time to time by the Legislature for that purpose,'" id. at 402 (quoting N.J.S.A. 52:18A-78.22).

The Court held that

> [t]he Authority's bonds and notes are not a debt or liability of the State. They state on their face that the State does not pledge its faith and credit to their payment. Although the Act not only contemplates that the State will make the necessary appropriations but also seeks to ensure this result, the State is under no legal obligation to do so. . . .
>
> Nor does the liability of the State on its lease agreements with the Authority create

48

> any debt of the State. Both the statute and the lease make clear that all rent payments from the State are subject to legislative appropriations.

[Id. at 410 (citations omitted).]

Thus, in circumstances where legislation sought to bind future Legislatures in a manner that implicated both the Debt Limitation and Appropriations Clauses, this Court was careful to note that the legislation survived those Clauses because the Legislature retained its constitutionally enshrined power to annually appropriate funds as necessary for the fiscal health of the State. No such reservation of power can be found in Chapter 78.

C.

Applying those principles here, Chapter 78's purported creation of an enforceable long-term financial contractual obligation, payable by the State through dedicated line items in ensuing annual appropriations acts, falls squarely within the sights of the Debt Limitation Clause and all that that Clause is intended to prohibit. The Debt Limitation Clause precludes such action precisely to save the State from itself -- itself being the presently positioned, albeit well-intentioned legislators and Governor, who were not given permission to fiscally bind, by contract or otherwise, future taxpayers, legislators, and governors tasked with evaluating on an annual basis the

49

appropriations spending for the fiscal year in issue, unless voter approval was obtained.

The Legislature and Governor were without power, acting without voter approval, to transgress the Debt Limitation Clause and, similarly, the corresponding Appropriations and other budget clauses of the State Constitution. See Behnke v. N.J. Highway Auth., 13 N.J. 14, 24 (1953) ("A state constitution, unlike the Federal Constitution, is not a grant but a limitation of legislative power. The State Legislature exercises a portion of the sovereign power residing in the people, subject to the limitation imposed by the Federal Constitution and its own organic law . . . ."); see also City of Camden, supra, 82 N.J. at 146 (noting that Appropriations Clause "cannot in any sense be regarded as merely providing governmental 'housekeeping details,' necessary and important but not truly vital").

The Legislature and Governor, as well as the many interested parties involved in the legislative process, may have included contractual words in Chapter 78, but those words, no matter their clarity, could not create an enforceable contract of the type asserted. The Debt Limitation Clause barred it. The amount of monies that Chapter 78 purports to contractually require the State annually to dedicate to pay down the unfunded liability of the various pension funds -- for example, the amount required in FY15 -- substantially exceeds the limits

50

annually allowed under the Debt Limitation Clause. In light of the Debt Limitation Clause's constitutional command, we hold that the contract rights set forth in Chapter 78 did not create a legally binding financial contract enforceable against the State.

Voter approval is required to render this a legally enforceable contractual agreement compelling appropriations of this size covering succeeding fiscal years; otherwise, this agreement is enforceable only as an agreement that is subject to appropriation, which under the Appropriations Clause renders it subject to the annual budgetary appropriations process. In that process, the payment may not be compelled by the Judiciary. See City of Camden, supra, 82 N.J. at 147-49 (addressing statutes purporting to create dedications of monies in future fiscal years); Enourato, supra, 90 N.J. at 402, 410 (addressing contracts promising to pay monies in future fiscal years).

At bottom, this matter concerns a statute. Contrary to what plaintiffs argued to this Court, this statute is not immutable. To restore their fiscal health, Chapter 78 set a schedule for payments into the pension funds that is capable of being revisited and evaluated in the political budgetary process against competing fiscal demands, as Appropriations Clause case law demands. This is City of Camden v. Byrne dressed in new clothing. Despite its trappings, Chapter 78 cannot

51

constitutionally dedicate future amounts of monies, in excess of Debt Limitation Clause limits, without voter approval. Absent compliance with the Debt Limitation Clause requirement of voter approval, Chapter 78's contractual language does not work an evasion of the rigors of the annual appropriations process. We conclude that Chapter 78 must be interpreted constitutionally to be an obligation that is subject to appropriation.

In sum, Chapter 78 collides with state constitutional provisions; the Debt Limitation Clause, the Appropriations Clause, and related budgetary constitutional provisions prevail. Those constitutional provisions establish the Constitution's prescribed way in which State government is to work. The Legislature was without power to alter that annual budget-setting scheme. Inclusion of contract words in Chapter 78 does not alter that outcome. This is not a clash between a "constitutional contract right," as the trial court and plaintiffs denominate it, and the Debt Limitation and Appropriations Clauses. There simply is no legally enforceable financial obligation imposed on the State by virtue of Chapter 78's enactment. That interpretation reconciles the present statute's desired funding mechanism with the constitutional provisions that define the State's annual budget process. Indeed, the Legislature's strong expression of intent remains clear in Chapter 78, but it does not bind future legislatures or

governors in a manner that strips discretionary functions concerning appropriations that our Constitution leaves to the legislative and executive branches.

Because of the importance of maintaining the soundness of the pension funds, the loss of public trust due to the broken promises made though Chapter 78's enactment is staggering. We recognize that the present level of the pension systems' funding is of increasing concern, as does the dissent.[7] But this constitutional controversy has been brought to the Judiciary's doorstep, and our obligation is to enforce the State Constitution's limitations on legislative power. The hyperbole of the dissent is no replacement for legal precedent, and it does not nullify state constitutional law interdicting the formation of the so-called binding contractual right asserted by plaintiffs. Our State Constitution compels the declaration that there is no valid contractual right under Chapter 78 that provides the basis for a contract impairment analysis under either the State or Federal Constitutions.

---

[7] The concern that the pension systems are underfunded and placed at risk does not license casting aside the Constitution's protections against financial ruin with the serenity embraced by the dissent. Our paramount obligation is to enforce the Constitution's prohibitions evenhandedly, whenever they apply, notwithstanding the mutual and legitimately widespread interest in seeing the fiscal health of the funds restored to safe levels.

IV.

We briefly pause to address views expressed in the dissent.

First, we note that even the dissent acknowledges that any Federal Contracts Clause analysis begins with a determination whether a binding contractual obligation has been created. See post ___ (slip op. at 29). And, whether legislative action creates a valid contract under state law goes beyond a determination of clear intent to enter into a contract; it includes the authority of a legislature to enter into the contract under the law of the state. See Appleby, supra, 271 U.S. at 380, 46 S. Ct. at 573, 70 L. Ed. at 999 (explaining, in Federal Contracts Clause analysis, that "construction and effect" of contract at issue depended on "the extent of the power of the State and city" under New York law to deed property under navigable waters to private persons). Thus, the impediment that the dissent seeks to ignore -- the State Constitutional interdiction against authorizing the Legislature to enter into a contract of the binding nature that plaintiffs argue and the dissent would find -- cannot be avoided.[8]  It is

---

[8] Although federal courts independently evaluate whether a valid contract exists, that inquiry generally is recognized to turn on state law and the United States Supreme Court accords "great weight" to a state's highest court on this issue. See Brand, supra, 303 U.S. at 100, 58 S. Ct. at 446, 82 L. Ed. at 691.  In Brand, supra, the United States Supreme Court held that Indiana law permitted formation of teacher contracts for an "indefinite period," see id. at 105, 58 S. Ct. at 448, 82 L. Ed. at 693, but

54

the necessary first hurdle no matter how much one might prefer to avoid it.

In postulating that the constitutional restrictions of the Debt Limitation Clause do not pertain to Chapter 78, the dissent picks selectively from language in certain prior Debt Limitation Clause cases. See, e.g., post at ___, ___, ___ (slip op. at 17, 19, 21). The dissent's effort to find the Debt Limitation Clause inapplicable to the asserted financial obligation at issue demonstrates the thinness of its analysis. The argument mounted by the dissent is irreconcilable with our Debt Limitation Clause jurisprudence.

The dissent's logic breaks down under scrutiny because it does not -- and cannot -- account for the uniform line of reasoning in this Court's decisions regarding the Debt Limitation Clause and its impact on legislative attempts to create legally enforceable financial obligations to which the State is bound year to year. That reasoning was summed up in

_____

in that case the Indiana Supreme Court invalidated such contracts based on its belief that the legislature, in general, could not contract to cede its power to change governmental policy in the future, Indiana ex rel. Anderson v. Brand, 5 N.E.2d 531, 532-33 (Ind. 1937). Unlike the present case, the Indiana Supreme Court did not rely on an express, specific provision in its state constitution restricting legislative power to enter into the contract at issue. Ibid. The dissent points to no federal case in which a court held that the Contracts Clause allows the creation of a contract that is interdicted by a distinct restriction on legislative power in a state constitution.

the most contemporary majority opinion on the subject, Lonegan II, supra, where we said that "debt that is legally enforceable against the State is subject to the Debt Limitation Clause," 176 N.J. at 13, and further reinforced that, "[b]y its terms, . . . the Clause as written requires voter approval only when the State is legally required to make payment on the debt it has incurred," id. at 14. Our State's constitutional case law has held true to this essential principle, and that principle defeats the dissent's position in this matter. See Lonegan I, supra, 174 N.J. at 446 (reaffirming that Debt Limitation Clause applies whenever State is legally obligated to have Legislature make payments of certain magnitude over successive fiscal years); In re Loans of N.J. Prop. Liab. Ins. Guar. Ass'n, supra, 124 N.J. at 77 (noting that loan can avoid transgressing debt clause by rendering it contingent on whether "Legislature will vote the necessary appropriation"); Enourato, supra, 90 N.J. at 410 (affirming that Debt Limitation Clause prohibition avoided if State not legally obligated to make appropriations for contractual leaseholds); Bulman, supra, 64 N.J. at 117-18 (holding long-term lease did not violate debt clause because rent installments were annually subject to appropriation); Holster v. Bd. of Trs., 59 N.J. 60, 72-73 (1971) (holding that statute purporting to require State funding was, in fact, subject to appropriation; thus, statute did not violate Debt

Limitation Clause).  Despite the rhetoric, the emotional references to the charged situation in which this financial issue has arisen, and the modifiers used by the dissent to undermine our mere present application of long-standing Debt Limitation Clause principles of law, the dissent's argument gains no greater substance.  Try as it might to interpret Debt Limitation Clause case law as governing only a narrow category of obligation, the dissent simply cannot wish away this Court's longstanding precedent.

Moreover, the dissent's suggestion that pension commitments are exempt from the Debt Limitation Clause does not withstand scrutiny.  No case holds that because a statute relates to pensions for public servants it somehow evades the Debt Limitation Clause case holdings.  As noted earlier, it is of no moment whether a matter relates to pensions or is labeled one that involves the overused term of "ordinary operating expense"; the label does not control the analysis.  What matters is not what the financing scheme is called, but the manner in which it operates.  See supra at ___ (slip op. at 35).  Thus, contrary to the dissent's assertion, the subject statute in City of Passaic did not survive Debt Limitation Clause analysis because the State's required annual contribution was "an 'ordinary government operating expense.'"  See post at ___ (slip op. at

57

17) (quoting dissent in Spadoro, supra, 150 N.J. at 11).[9] Instead, as this Court has made clear in numerous cases interpreting and applying the City of Passaic holding, the statute at issue there was permissible under the Debt Limitation Clause because the payment it required was one that was subject to legislative appropriation; for that reason, it did not create an impermissible binding financial obligation enforceable against the State.  See Holster, supra, 59 N.J. at 71 (describing "point" of City of Passaic to be "that a projected or anticipated future legislative appropriation is not a present debt or liability," as "[a] future legislature is not bound to make the appropriation"); State ex rel. McLean v. Lanza, 27 N.J. 516, 525-26 (1958) (referring to statutorily required contribution in City of Passaic as "a truly 'voluntary appropriation'" outside Debt Limitation Clause's scope).

In the end, this case turns on the legality, under State constitutional principles, of the Legislature's attempt to create a contract in this matter.  Because the dissent misconstrues the import of Debt Limitation Clause jurisprudence, it fails to appreciate that the Clause bars the Legislature from

---

[9] It bears adding that, although the dissent in this matter relies on the dissents in Spadoro and in Lonegan II, dissenting opinions are not binding authority.  See In re Civil Commitment of W.X.C., 204 N.J. 179, 194-95 (2010).

creating a binding obligation in Chapter 78. By virtue of that failure, the dissent inexplicably maintains that Chapter 78 creates some form of federal substantive constitutional right. See post at ___, ___ (slip op. at 25-26, 33).

The only reconfiguration at work in the consideration of this matter takes place as part of the dissent's view of what contracts may constitutionally be created. In its attempt to support its basic proposition -- that in order for the Legislature to create a valid, enforceable legislative contract in a statute, all that is necessary is a clear and unambiguous expression of intent on the part of the Legislature -- the dissent relies entirely on this Court's holding in Spina, supra. See post at ___ (slip op. at 10-12). In the dissent, Spina is elevated to a status never before conferred on it in any prior opinion: the seminal case regarding the "conditions" for a binding public contract. See post at ___ (slip op. at 12). Notwithstanding the dissent's characterization of this Court's holding in Spina, that opinion contains no suggestion that the Court intended it to serve as a comprehensive guide for the creation of a contract. Instead, the Court addressed conditions relevant to the factual context of that case; it did not create a roadmap setting forth all the conditions that would be, per se, sufficient to create a valid contract. Moreover, the dissent's reference to the Appellate Division's application of

the "test in Spina" in NJEA, post at ___ (slip op. at 11), ignores the panel's enumeration of multiple bases for finding "no constitutionally-protected contract right to systematic funding," most significantly the fact that such a finding would offend the Appropriations and Debt Limitation Clauses of our State Constitution. NJEA, supra, 412 N.J. Super. at 216-17.

In sum, the State Constitution simply does not permit Chapter 78's payment provisions to have any more binding effect than that of a contract that is subject to appropriation. As it informed us at argument and in its brief, the State fully understands the limits imposed by the fiscal clauses. The State makes, for example, all multi-year collective negotiations agreements and leases expressly subject to appropriation, as well as other contract types identified in its briefing, including payment of claims and judgments under the Tort Claims Act and the Contractual Liability Act. See N.J.S.A. 59:12-1; N.J.S.A. 59:13-9.[10] Those essential and practical measures by the State are ignored by the dissent in its perception of how state government presently conducts its business. It would seem that it is not the majority's but the dissent's view that would have "far-reaching, negative consequences," post at ___ (slip

_____

[10] The State also referenced contracts for the purchase of goods and services that the Division of Purchase and Property enters into and contracts for the rental of property.

op. at 6), for the conduct of state government had it been the one to prevail in this matter.

In closing, to be clear, we are not declaring Chapter 78 unconstitutional, contrary to the dissent's suggestion that the majority is "striking down," "voiding," or "invalidating" that statute. Chapter 78 remains in effect, as interpreted, unless the Legislature chooses to modify it. There is no need to address severability or the mutuality of obligations. Those considerations are for the political branches. Finally, it bears emphasis that the parade of horribles on which the dissent is focused is premised on the dark prediction that pension members' benefits will go unpaid in the future. Again, contrary to the dissent's attempt to conflate those issues, that question of the State's obligation to pay benefits is not before this Court. Our holding is, simply, that Chapter 78 cannot constitutionally create a legally binding, enforceable obligation on the State to annually appropriate funds as Chapter 78 purports to require.

V.

That the State must get its financial house in order is plain. The need is compelling in respect of the State's ability to honor its compensation commitment to retired employees.[11] But

---

[11] We reiterate that there is no question that individual members of the public pension systems are entitled to this delayed part

this Court cannot resolve that need in place of the political branches. They will have to deal with one another to forge a solution to the tenuous financial status of New Jersey's pension funding in a way that comports with the strictures of our Constitution.

The Debt Limitation Clause and the Appropriations Clause envisioned the absence of the Judiciary from the annual budget-making process and prevent it from having to perform the unseemly role of deciding in that process whether a failure to fully fund a statutory program, including one labeled a contract, was reasonable and necessary. If we had been required to engage in a contract impairment analysis, the third prong to that analysis -- whether the State's action that substantially impaired the contract "is reasonable and necessary to serve an important public purpose," U.S. Trust Co., supra, 431 U.S. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112 -- would have required annual incursions by the Judiciary into second-guessing spending priorities and perhaps even revenue-raising considerations in recurring years.

---

of their compensation upon retirement, but, as stated at the outset, that is not in question in the instant matter before this Court. That said, the State repeatedly asserted at oral argument that it is not walking away from its obligations to the pension systems and to pay benefits due to retirees.

The enactment of an appropriations act prior to the June 30 close of the fiscal year is the culmination of a budget process that entails several months of analysis, hearings in the Senate and Assembly, and negotiation of a final budget, as described in this record in the Certifications of State Treasurer Andrew P. Sidamon-Eristoff and Director of the Division of Budget and Accounting, Department of the Treasury, Charlene M. Holzbaur. Were the Court to undertake a contract impairment analysis, that process would constitute only the first of two steps in the appropriations process. In any fiscal year in which the payment mandated by Chapter 78 was not made in full, the second step could be judicial review of the appropriations determined by the Legislature and Executive.

In each of those years, the State would be required to present the argument that it makes before this Court to justify its reduced pension payment in FY15: that the Legislature's decision not to appropriate the full pension payment is reasonable and necessary so that the State may serve essential public needs, justifying the contract impairment for purposes of the Federal and State Contracts Clauses. See U.S. Trust Co., supra, 431 U.S. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112; Farmers Mut. Fire Ins. Co. of Salem, supra, 215 N.J. at 546-47. Parties in plaintiffs' position, seeking to challenge the reduced payment, would counter that the Legislature improperly

63

placed competing fiscal considerations ahead of pension payments required by Chapter 78.  In short, the propriety of the budget priorities of the Legislature and Executive would be litigated.

To resolve those arguments, a trial court would be required to determine whether the Legislature properly balanced competing budget priorities, a determination likely followed by appellate review on that issue.  The Judiciary could not fairly assess those priorities without reviewing the information and analysis on which the Legislature and Executive based the determinations leading to the Appropriations Act -- a protracted undertaking that would essentially reproduce the elaborate budgeting process undertaken in step one.[12]  The determination to prioritize one appropriation decision above another is best left to the marketplace evaluators and the electorate, to whom the State must answer on such comparative evaluations of fiscal priorities.

Plaintiffs contend that the remedy imposed by the trial court does not intrude on powers exclusively granted to the Legislature and Executive because it is not an order directing a

---

[12] Review of the FY15 Appropriations Act reveals that the Legislature made decisions among many competing priorities.  In addition to public employee pension contributions, the State's annual budget included appropriations that encompassed: education aid programs, school construction debt, municipal aid, Medicaid, adult prison and juvenile facilities, human services institutions, property tax relief, and State employee salary programs.  See generally L. 2014, c. 14.

specific appropriation but, instead, a mere declaratory judgment representative of the court's intent to afford the other branches an opportunity to act "in accordance with the court's decree." That argument presents a distinction without a difference. If a trial or appellate court determines that the Legislature's substantial impairment of a contract is not "reasonable and necessary to serve an important public purpose," U.S. Trust Co., supra, 431 U.S. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112, it necessarily makes two critical determinations. First, the court decides that the Legislature's budgeting priorities were misplaced for the fiscal year in question, violating the Contracts Clause. Second, the court directs that the budgeting priorities for that fiscal year be reordered and revised in order that the pension payment be increased. The absence of an order directing a specific appropriation is of no moment; the judicial remedy compels the Legislature and Executive to exercise their constitutional authority in a manner prescribed by the court, not the manner that they choose.

Ultimately, the Contracts Clause reasonable-and-necessary analysis implicated in this case would require the Judiciary to exercise authority that is exclusively granted to the political branches. N.J. Const. art. VIII, § 2, ¶ 2; N.J. Const. art. V, § 1, ¶ 15; see also City of Camden, supra, 82 N.J. at 158; Karcher, supra, 97 N.J. at 489-90. In this setting, the

application of a Contracts Clause analysis by the Judiciary would cause a violation of our Constitution's separation-of-powers principles.  See N.J. Const. art. III, ¶ 1 (providing that no branch of government may "exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution").

The practical impact of a Contracts Clause analysis in this case underscores the wisdom of the fiscal clauses.  In denying the Legislature and Executive the authority to enter into contracts that violate the Debt Limitation Clause, the Appropriations Clause, and the line-item veto power of the Governor, the Framers ensured that State appropriations would be determined annually by the citizens' elected representatives, on the basis of revenue anticipated in a given fiscal year.  By virtue of the constraints imposed by those provisions, the State is simply not authorized to enter into the financially binding contract contemplated by Chapter 78, and the Judiciary is not called upon to reassess the fiscal determinations of its coordinate branches.  The responsibility for the budget process remains squarely where the Framers placed it:  on the Legislature and Executive, accountable to the voters through the electoral process.  Ultimately, it is the people's responsibility to hold the elective branches of government responsible for their judgment and for their exercise of

66

constitutional powers.  This is not an occasion for us to act on the other branches' behalf.

Moreover, although the trial court did not reach the issue, we similarly decline to wade into the murky waters of an equal protection analysis in respect of the Legislature's and Executive's decision to appropriate for one purpose over another where subject-to-appropriation liabilities or debts are concerned.  An equal protection analysis as to such decisions inevitably leads to the same quagmire as a reasonable-and-necessary analysis, and as we have explained, in this matter the Judiciary is ill-suited to enter into the political decision making that accompanies the balancing of competing spending priorities.

Our conclusion that no enforceable contract was created here because the Debt Limitation Clause prohibited the Legislature and Governor from binding the State to an enforceable contract of this nature eliminates the need to engage further in a contract impairment analysis.[13]

---

[13] Although we do not engage in a Federal Contracts Clause analysis, we note only that the dissent's reliance on United States Trust Co., supra, as support for its sought-after result here is misplaced.  431 U.S. 1, 97 S. Ct. 1505, 52 L. Ed. 2d 92. That case did not involve a finding of contract impairment in the face of constitutional interdiction against contract creation.  That case did not involve an appropriations-backed contract.  Rather, the offending statute diverted dedicated New York/New Jersey Port Authority toll revenue, thereby materially increasing the risk contractually accepted by bondholders.  Id.

That conclusion resolves both the federal, as well as any state, constitutional contract impairment claim.

## VI.

The judgment of the trial court is reversed.

JUSTICES PATTERSON, FERNANDEZ-VINA, and SOLOMON and JUDGE CUFF (temporarily assigned), join in JUSTICE LaVECCHIA's opinion.  JUSTICE ALBIN filed a separate, dissenting opinion in which CHIEF JUSTICE RABNER joins.

---

at 3-4, 9-14, 97 S. Ct. at 1508, 1511-13, 52 L. Ed. 2d at 97-98, 101-04.  Thus, the case did not involve any of the state constitutional provisions at issue in this matter.

CHRISTOPHER BURGOS,
Individually and as President
of the State Troopers
Fraternal Association of New
Jersey; JAMES KIERNAN,
Individually and as President
of State Troopers Non-
Commissioned Officers
Association of New Jersey
State, Inc.; STEPHEN STERNIK,
Individually and as President
of State Troopers Superior
Association of New Jersey;
STATE TROOPERS FRATERNAL
ASSOCIATION OF NEW JERSEY, on
behalf of all its present and
retired members; STATE
TROOPERS NON-COMMISSIONED
OFFICERS ASSOCIATION OF NEW
JERSEY, INC., on behalf of
all its present and retired
members; and STATE TROOPERS
SUPERIOR OFFICERS ASSOCIATION
OF NEW JERSEY, on behalf of
all its present and retired
members,

      Plaintiffs-Respondents,

        v.

STATE OF NEW JERSEY;
CHRISTOPHER CHRISTIE,
Governor of the State of New
Jersey; ANDREW SIDAMON-
ERISTOFF, Treasurer of the
State of New Jersey; NEW
JERSEY STATE SENATE; and NEW

JERSEY STATE GENERAL
ASSEMBLY,

      Defendants-Appellants,

          and

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO;
PROFESSIONAL FIREFIGHTERS
ASSOCIATION OF NEW JERSEY,
IAFF, AFL-CIO; NEW JERSEY
FRATERNAL ORDER OF POLICE;
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, COUNCIL 73;
AMERICAN FEDERATION OF
TEACHERS NEW JERSEY STATE
FEDERATION, AFL-CIO;
INTERNATIONAL FEDERATION OF
PROFESSIONAL AND TECHNICAL
ENGINEERS, AFL-CIO & CLC,
LOCAL 195; HEALTH
PROFESSIONAL AND ALLIED
EMPLOYEES, AFT, AFL-CIO; NEW
JERSEY STATE AFL-CIO; SANDRA
P. COHEN; MICHAEL A.
JUSTINIANO; DOMINICK MARINO;
DONNA CHIERA; DIANE CAMERON;
and RUSSELL LEAK,

      Plaintiffs-Respondents,

          v.

CHRIS CHRISTIE, as Governor
of the State of New Jersey;
NEW JERSEY DEPARTMENT OF THE
TREASURY; and ANDREW P.
SIDAMON-ERISTOFF, Treasurer,
State of New Jersey,

      Defendants-Appellants,

2

and

NEW JERSEY EDUCATION
ASSOCIATION; NEW JERSEY STATE
POLICEMEN'S BENEVOLENT
ASSOCIATION, INC.; NEW JERSEY
STATE FIREFIGHTERS' MUTUAL
BENEVOLENT ASSOCIATION;
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, COUNCIL 1, AFL-
CIO; CHRISTINE SAMPSON-CLARK;
HEIDI OLSON; PATRICIA
PROVNICK; KEITH DUNN; PATRICK
COLLIGAN; MARC KOVAR;
TIM DEUTSCH; KYLE HUGHES;
JOHN E. MURPHY, JR.; LANCE P.
LOPEZ, SR.; THE NEW JERSEY
PRINCIPALS AND SUPERVISORS
ASSOCIATION; JANET S. ZYMROZ;
JOHN C. ALFIERI, JR.; HOPE
GRANT; and ROSARIO CAPACCIO,

        Plaintiffs-Respondents,

             v.

STATE OF NEW JERSEY;
CHRISTOPHER J. CHRISTIE, as
Governor of the State of New
Jersey; NEW JERSEY DEPARTMENT
OF THE TREASURY; and ANDREW
P. SIDAMON-ERISTOFF,
Treasurer, State of New
Jersey,

        Defendants-Appellants,

             and

PROBATION ASSOCIATION OF NEW
JERSEY, PROFESSIONAL CASE-
RELATED UNIT; PROBATION
ASSOCIATION OF NEW JERSEY,

3

PROFESSIONAL SUPERVISORS
UNION; DWIGHT COVALESKIE;
GAVIN CUMMINGS; and ELLEN
CRIBBIN,

     Plaintiffs-Respondents,

        v.

STATE OF NEW JERSEY;
CHRISTOPHER J. CHRISTIE, as
Governor of the State of New
Jersey; NEW JERSEY DEPARTMENT
OF THE TREASURY; and ANDREW
P. SIDAMON-ERISTOFF,
Treasurer, State of New
Jersey,

     Defendants-Appellants.

     JUSTICE ALBIN dissenting.

     Today, the majority strikes down a law -- Chapter 78, L. 2011, c. 78 -- vaunted by the Governor and Legislature as the solution to the State's pension crisis.  The decision strikes down the promise made to hundreds of thousands of public workers by the political branches of government that deferred wages earned for years of service would be funded during their retirement.  The decision unfairly requires public workers to uphold their end of the law's bargain -- increased weekly deductions from their paychecks to fund their future pensions -- while allowing the State to slip from its binding commitment to make commensurate contributions.  Thus, public workers continue to pay into a system on its way to insolvency.

4

The Governor and Legislature cannot walk away from the contractual commitments they signed into law in Chapter 78. Their failure to make the required payments into the pension fund constitutes an impairment of their contract with public workers. The United States Constitution is the supreme law of the land, U.S. Const. art. VI, cl. 2, and prohibits any state from passing a law impairing a contract -- even its own contract. The Federal Contracts Clause, U.S. Const. art I, § 10, cl. 1, restricts New Jersey from eviscerating the pre-existing contractual rights of public workers, notwithstanding provisions of its own Constitution.

The Governor and Legislature have the sovereign power to enter into contracts. Chapter 78 meets the very conditions set by this Court for the establishment of a binding public contract. See Spina v. Consol. Police & Firemen's Pension Fund Comm'n, 41 N.J. 391, 404-05 (1964). Despite the legislative enactment of a public contract satisfying the test in Spina, the majority announces that those rights belonging to public workers are unenforceable under the New Jersey State Constitution's Debt Limitation Clause, N.J. Const. art. VIII, § 2, ¶ 3, and Appropriations Clause, N.J. Const. art. VIII, § 2, ¶2.

Never before, until today, has the Debt Limitation Clause been applied to the ordinary operating expenses of government, such as deferred compensation earned by public workers and

5

payable as pension benefits.  Indeed, this Court previously held that a statute requiring the State to make annual contributions to a pension fund is not a debt within the intendment of the Debt Limitation Clause.  See City of Passaic v. Consol. Police & Firemen's Pension Fund Comm'n, 18 N.J. 137, 147 (1955).  Moreover, this Court has held that the Appropriations Clause cannot stand as a barrier to the enforcement of constitutional rights.  In short, the majority's contention that the Governor and Legislature's contract with public workers is unenforceable under state law has no contemporary legal support.

Even if enforcement of the contractual rights embedded in Chapter 78 were barred by the majority's interpretation of the New Jersey Constitution's Debt Limitation and Appropriations Clauses, those rights would be enforceable under the Federal Constitution's Contracts Clause, which was intended to prevent precisely what occurred here -- a State destroying a contract of its own making.  Rights protected by the Federal Constitution cannot be defeated by a novel interpretation or reconfiguration of state contract law.

The majority's decision will have far-reaching, negative consequences.  The majority has declared that it will not enforce a statute intended to stem decades of political dysfunction that has resulted in the balancing of budgets on the backs of public workers.  The majority has concluded that it

6

will not uphold any law that the Governor and Legislature pass that is intended to bind the political branches to funding a pension system on which public workers relied when entering public service.  The majority states that the rights contractually promised by the Legislature require voter approval.  However, the Federal Contracts Clause was expected to protect contractual rights from majority rule.

The majority's cheery assurance that "there is no question that individual members of the public pension systems are entitled to [the] delayed part of their compensation upon retirement," ante at __-__ (slip op. at 61-62 n.11), runs counter to its constitutional analysis that the political branches cannot be compelled to fund the pension system.  The dismal logic of the majority's decision is that the political branches, in accordance with the State Constitution, can let the pension fund run dry and leave public service workers pauperized in their retirement.

The public workers, now left without an enforceable legal right to funding of wages they have earned, are not strangers to us.  They are the police officers who protect our citizens and neighborhoods from violent crime; the firefighters who enter burning homes to save lives and salvage property; the teachers who educate our children; the prosecutors, public defenders, and judges, and their staffs, who operate our system of justice; the

7

crews who pave our roads and recycle our waste; and the myriad other workers who, in their unheralded ways, improve the quality of life for almost nine million people in New Jersey and allow State and local governments to operate.

Unlike the majority, I believe public workers have protectable contractual rights under the United States Constitution -- as the Legislature and Governor intended in enacting Chapter 78. Chapter 78 was not an aspirational or moral promise, but a solemn contract, which, once made, is binding on the State and cannot be nullified without offending the Federal Constitution's Contracts Clause. I therefore respectfully dissent.

I.

A.

The current pension crisis is the backdrop to the constitutional issues before us. A brief historical primer is necessary to give those issues context.

Public workers enter into the career service with a promise, engraved in statute, that part of their wages will be deferred until their retirement. Public employees have earned their present and deferred wages by their labor. To fund the pension system, deductions are made from each employee's paycheck, and the State and municipalities are statutorily required to make their contributions.

8

For decades, the State has been mandated by statute to "make annual [contributions to the pension system] . . . pursuant to standard actuarial practices."  L. 1997, c. 113, § 5; see N.J. Educ. Ass'n v. State (NJEA), 412 N.J. Super. 192, 195-96 (App. Div.), certif. denied, 202 N.J. 347 (2010).  Since 1997, our pension laws have assured public workers that they "shall have a non-forfeitable right to receive benefits as provided under the laws governing the retirement system or fund upon the attainment of five years of service credit in the retirement system or fund."  N.J.S.A. 43:3C-9.5(b).  The "'non-forfeitable right to receive benefits' means that the benefits program, for any employee for whom the right has attached, cannot be reduced."  N.J.S.A. 43:3C-9.5(a).

The "non-forfeitable right" to receive one's deferred wages is a hollow right if there is insufficient money in the pension fund to pay those wages.  Public workers have never been given a holiday from making their contributions into the pension system.  However, from 1997 through 2012, the State failed to pay its full annual required contribution.  Indeed, over that period, the State paid less than ten percent of its statutorily required contribution into the pension system.  Truth & Consequence: Status Report of the N.J. Pension & Health Benefit Study Commission 6-8 (Sept. 25, 2014).  Successive legislatures and administrations balanced yearly budgets while shortchanging the

9

fund necessary to make good the deferred compensation owed to public workers. The State's yearly neglect to pay its statutorily mandated contribution into the pension fund has brought us to the current crisis.

B.

In enacting Chapter 78, the Legislature took direction from this Court's language in Spina, supra, 41 N.J. at 405, and the Appellate Division's language in NJEA, supra, 412 N.J. Super. at 213.

In Spina, this Court spelled out how the Legislature could make a binding public contract. In that case, firefighters and police officers brought suit, alleging that a 1944 legislative enactment increasing the age at which they could retire and receive pension benefits violated their contractual rights set in a 1920 law. Spina, supra, 41 N.J. at 393. This Court determined that the 1920 law did not create a contractual right to receive benefits at the ages set in that law. Id. at 400. It came to that conclusion because the 1920 law did not use sufficiently explicit language to suggest that the Legislature intended to confer a contractual right. Ibid. The Court noted, "Not a word smacks of an intent to require or to permit one." Ibid. The Court recognized that "the general approach in our State [is] that the terms and conditions of public service in office or employment rest in legislative policy rather than

10

contractual obligation." Ibid. (emphasis added). Nevertheless, the Court acknowledged that the Legislature had the power to create binding "public contracts" that restricted its policy choices. Id. at 405. The Court stated: "The responsibility for creating public contracts is the Legislature's. A commitment of that kind should be so plainly expressed that one cannot doubt the individual legislator understood and intended it."[1] Ibid.

The Appellate Division in NJEA, supra, looked to the test in Spina in resolving the issue before it. See 412 N.J. Super. at 207-15. In NJEA, certain active and retired members of the New Jersey Education Association, as well as the Association, brought a lawsuit seeking redress for the State's failure to make its statutorily mandated contributions to the Teachers' Pension and Annuity Fund for fiscal years 2004 through 2007.

---

[1] I disagree with the majority that the Spina Court intended this quoted language to apply only to laws passed by the Legislature creating public contracts enforceable against municipalities and not against the State. While it is true that the focus in Spina was the 1920 law that required municipalities to fund the pension system, the Court's opinion noted that under legislation in 1944, the "State agreed to contribute $1,000,000 annually" to the pension fund and under legislation in 1952, the State agreed to pay one-third of the "amount needed to achieve actuarial solvency" in the then unfunded deficit. Id. at 396-97. Therefore, the Spina Court undoubtedly recognized that in the realm of pension funding, under its ruling, the legislative creation of contractual rights would bind the State, not just municipalities.

11

Id. at 192, 195-96.  The Appellate Division ultimately concluded that although the public employees who contributed to the Teachers' Pension Fund were "entitled by law to the receipt of vested benefits upon retirement," they did not possess a "constitutionally-protected contract right to the particular level, manner or method of State funding provided in the statute."  Id. at 196.  The appellate panel reached that conclusion because the statutory language did not "clearly and unequivocally express an explicit enforceable legislative commitment" to create a contractual right in the manner required by Spina.  Id. at 213.  Referring to Spina, the panel found it far from clear that the "'individual legislator[]' . . . would have 'understood and intended'" to create a contractual obligation to fund the pension system.  Id. at 214 (quoting Spina, supra, 41 N.J. at 405).

In Chapter 78, enacted on June 28, 2011, the Legislature intended to satisfy the conditions for a binding public contract required in Spina and NJEA.  Both the Legislature and Governor lauded Chapter 78 as the answer to the irresponsible underfunding of the pension system in previous years.

C.

The language in Chapter 78 clearly establishes the intent of the Legislature and Governor to create an enforceable contractual right to funding of the pension system -- a point

12

not disputed by the majority.  N.J.S.A. 43:3C-9.5(c) in relevant part reads:

> (1)   The State and all other applicable employers shall make their annual normal contribution to each system or fund . . . . The amount of the State's annually required contributions shall be included in all annual appropriations acts as a dedicated line item.
>
> (2)   Each member of the [State's pension systems] . . . shall have a contractual right to the annual required contribution amount being made by the member's employer or by any other public entity.  The contractual right to the annual required contribution means that the employer or other public entity shall make the annual required contribution on a timely basis . . . .  The failure of the State or any other public employer to make the annually required contribution shall be deemed to be an impairment of the contractual right of each employee.  The Superior Court, Law Division shall have jurisdiction over any action brought by a member of any system or fund or any board of trustees to enforce the contractual right set forth in this subsection.   The State and other public employers shall submit to the jurisdiction of the Superior Court, Law Division and shall not assert sovereign immunity in such an action.
>
> [L. 2011, c. 78, § 26 (codified at N.J.S.A. 43:3C-9.5(c)) (emphasis added).]

The contractual language here is "so plainly expressed that one cannot doubt the individual legislator understood and intended it."  See Spina, supra, 41 N.J. at 405.

Chapter 78's enactment represented a historic compromise. Public workers would pay more into the pension fund through increased deductions from their paychecks, and the State would

13

do what it was always required to do -- pay its fair share into the fund to insure its solvency.  The State's intention to enter into a solemn, binding contract with its employees is clear not only from the plain language of the statute, but also from the Governor's various public statements.  At a Town Hall appearance just days before Chapter 78's enactment, the Governor stated that the new law "makes it a contractual right of the folks in the pension system to have those payments made.  We're further locking ourselves [into] making those payments along those schedule[s]."  See NJ Citizen Action Joins Pension Lawsuit, Politicker NJ (Apr. 28, 2015), http://politickernj.com/2015/04/nj-citizen-action-joins-pension-lawsuit/ (quoting Governor's remarks at 2011 appearance).  At the signing of Chapter 78, the Governor stated, "The reforms that we sign today . . . are an assurance to the hard working men and women in government all across New Jersey that when the time comes for them to retire their pension will be there for them to collect[.]"  Press Release, Office of the Governor, Governor Christie Signs Bipartisan Pension & Health Benefits Reform Bill (June 28, 2011), available at http://www.state.nj.us/governor/news/news/552011/approved/201106 28c.html.

No doubt, many public workers took the legislation at its word, and arranged their lives based on the contractual

guarantees in Chapter 78. Some may have remained in the career service and others joined it based on the seemingly ironclad contractual language in the legislation.

Chapter 78, like any legislative enactment, was clothed with a presumption of constitutionality. See Lewis v. Harris, 188 N.J. 415, 459 (2006). That presumption could only be overcome by a showing that Chapter 78's "repugnancy to the Constitution [was] clear beyond a reasonable doubt." See ibid. (internal quotation marks and citation omitted). This jurisprudential canon required that Chapter 78 be read in a way that strongly favored its validity.

Two years after Chapter 78 was signed into law, and the public fanfare over its passage, the State reneged on making its statutorily required payments into the pension system. In an about-face, the State claimed that the portion of the law mandating that it make its annual required contribution to the pension fund violates the Debt Limitation Clause and the Appropriations Clause of the New Jersey Constitution while insisting on the validity of that portion of the law mandating increased deductions from public employees' paychecks. The State argued that the law passed by the Legislature and signed by the Governor was unconstitutional beyond a reasonable doubt. The majority essentially adopts this argument and submits that the State's contractual obligation is unenforceable under the

15

State Constitution.

However, until today's decision, our jurisprudence, Spina in particular, signaled that a public contract is enforceable under the New Jersey Constitution. State law cannot be reconfigured and then used as an instrument to undermine the Federal Constitution, which protects against state-legislative impairment of contractual rights. The Contracts Clause of the Federal Constitution forbids the State from doing precisely what occurred here. The State cannot enter into a public contract when to do so benefits it, and then legislatively impair that contract when abiding by the contract no longer suits it.

Before turning to federal law, a review of our state-law jurisprudence will show that the majority has mistakenly concluded that Chapter 78 violates the Debt Limitation Clause and Appropriations Clause of the New Jersey Constitution and is therefore unenforceable.

II.

A.

In striking down Chapter 78, the majority construes the State Constitution's Debt Limitation Clause in an unprecedented way that is at odds with the intent, history, and jurisprudence of the Clause. The majority also eviscerates Spina's protection of public contractual rights.

The Debt Limitation Clause provides in relevant part that

16

> [t]he Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year[.]
>
> [N.J. Const. art. VIII, § 2, ¶ 3.]

This Court has previously determined that the State's statutorily required pension contributions are not a debt within the intendment of the Clause. In City of Passaic, supra, the Court held that a statute requiring the State to annually contribute to a pension fund for a period of thirty years did not violate the Debt Limitation Clause. 18 N.J. at 144, 147. The Court "reject[ed] the argument that the statutory provision requiring the State to contribute to the fund constitute[d] the creation of a state debt contrary to [the Debt Limitation Clause]." Id. at 147. The Court wrote that "[n]o debt has been created here, but rather present legislation merely provides that the State shall annually contribute to the fund." Ibid. Implicit in the Court's decision was a recognition that the State's annual contributions did not constitute a debt because such a payment is an "ordinary government operating expense." See Spadoro v. Whitman, 150 N.J. 2, 11 (1997) (Handler, J., concurring in part and dissenting in part) (citing City of Passaic, supra, 18 N.J. 137).

17

In Spadoro, Justice Handler expressed that "[t]he provision of pensions for public employees is simply a part of the State's obligation to compensate its employees, and is clearly a regular function of government and an ordinary government operating expense," and therefore is not a debt.  See id. at 11.[2]

The drafters of the Debt Limitation Clause surely did not intend that paying public workers for the work they are presently performing is a debt.  The Framers of New Jersey's 1844 Constitution adopted the Debt Limitation Clause to check speculative investments by the state and, as such, to restrict the current Legislature from placing on future generations of taxpayers binding financial obligations.  Lonegan v. State (Lonegan II), 176 N.J. 2, 14 (2003).  The Debt Limitation Clause "was enacted originally to 'protect against the type of

---

[2] In Spadoro, supra, the issue was whether the Debt Limitation Clause was violated by a statute providing for the issuance of $2.7 billion in bonds by a state authority that would be "used to pay the State's obligations for the unfunded accrued liability of several state pension systems."  150 N.J. at 2-4 (Handler, J., concurring in part and dissenting in part).  The Court did not reach the merits of the case because it deemed the issue to be moot.  Id. at 2.  Justice Handler wrote a separate concurring and dissenting opinion, which concluded that the Debt Limitation Clause was violated by the State's borrowing of money to pay off its pension obligations.  Id. at 4, 10-11 (Handler, J., concurring in part and dissenting in part).  Importantly, Justice Handler noted that a statute requiring the State to make annual pension contributions was not a debt under the Clause. Id. at 11.

18

financial debacle experienced' by other states that had borrowed without restraint during the 1830s." Ibid. (emphasis added) (quoting Lonegan v. State (Lonegan I), 174 N.J. 435, 443-44 (2002)). States engaged in heavy borrowing, speculating in western lands and risky capital projects that led to a number of states defaulting on their obligations. Lonegan I, supra, 174 N.J. at 444. Even though New Jersey had not defaulted on its loans, it sought to prevent financial catastrophe by adopting one of the country's first debt limitation clauses. Ibid. Thus, "the Clause prohibits one Legislature from incurring debts that subsequent Legislatures would be obliged to pay, without prior approval by public referendum." Id. at 444-45 (internal quotations marks omitted). The Framers, however, did not intend the Debt Limitation Clause to prevent the State from funding ordinary, "essential[,] and appropriate governmental functions." See Lonegan II, supra, 176 N.J. at 14.

The pension owed to public workers is a form of deferred compensation for the service they perform and therefore is part of their accrued salary. Chapter 78 requires the State to make its contribution to the pension fund so that the deferred compensation earned by public workers will be available when they retire. See Corvelli v. Bd. of Trs., 130 N.J. 539, 552 (1992) (noting that "prevailing view" is that pensions are deferred compensation); Masse v. Bd. of Trs., 87 N.J. 252, 260

19

(1981) ("Th[e] legislative intent that the governmental pension constitutes compensation for services rendered over a period of time has been accorded substantial judicial recognition.").

The State's withholding of monies from a public worker's pension is no different than the State's withholding part of the worker's salary. The Debt Limitation Clause was ratified to address a much different scenario than obligating the State to pay the ordinary operating expenses of government, which include placing a public worker's deferred wages into a pension fund.

Significantly, no member of the Court, in either the majority or dissenting opinions in Lonegan II, supra, expressed a view that requiring the State to pay the ordinary operating expenses of running the government would be disallowed by the Debt Limitation Clause. See 176 N.J. at 19. The dissenting Justices who were inclined to give an expansive reading to the Debt Limitation Clause in cases involving appropriations-backed debt would have excluded from the Clause's reach "labor agreements, leases, and any other arrangement or transaction that does not require the State's contractual borrowing of funds." Id. at 24 (Long, Verniero, and Zazzali, JJ., dissenting). This viewpoint was well within the mainstream understanding of the Debt Limitation Clause.

Other states have concluded that mandated contributions to a pension fund do not constitute a debt for purposes of their

20

debt limitation clauses.  See, e.g., Rochlin v. State, 540 P.2d 643, 648 (Ariz. 1975) (concluding that unfunded liability of pension is not debt under State Constitution's debt limitations sections); State ex rel. Wittler v. Yelle, 399 P.2d 319, 320-21, 324-25 (Wash. 1965) (holding that statutes increasing payment to pension fund did not violate state's debt limitation clauses because "debt" is defined as "borrowed money and [does] not warrant obligations for the payment of the current expenses of the state government such as services rendered and materials furnished"); Booth v. Sims, 456 S.E.2d 167, 176 (W. Va. 1994) (noting longstanding principle that "pension systems do not involve the creation of an unconstitutional debt" under state's debt limitation clause).

Last, in Lonegan II, supra, the Court interpreted narrowly the "shall not, in any manner, create a debt" language of the Debt Limitation Clause to exclude "appropriations-backed" debt from the constraints of the Clause.  176 N.J. at 18-21.  Yet, here the majority reads the "in any manner" language expansively to disallow payment of the ordinary operating expenses of government through Chapter 78.  See ante at __-__ (slip op. at 37-42).  The "in any manner" language should not be elastic when applied to capital projects but unbendable when applied to human capital.

In summary, the majority's voiding of Chapter 78 based on

the Debt Limitation Clause cannot be squared with the intent of the Clause or this Court's jurisprudence.

B.

Contrary to the majority's assertions, our State Constitution's Appropriations Clause, N.J. Const. art. VIII, § 2, ¶ 2, does not compel the invalidation of Chapter 78. The Appropriations Clause provides, in pertinent part: "All moneys for the support of the State government and for all other State purposes as far as can be ascertained or reasonably foreseen, shall be provided for in one general appropriation law covering one and the same fiscal year . . . ." N.J. Const. art. VIII, § 2, ¶ 2. I do not quarrel with the notion that the Legislature can pass a law funding a project one year, and repeal the project's funding the next year. City of Camden v. Byrne, 82 N.J. 133, 154-55 (1980). The Legislature ultimately is responsible for setting the State's social policy and needs against available resources in producing a balanced budget. Id. at 148. However, as we stated in Spina, supra, the Legislature can limit its own policy choices by entering into a clear, unequivocal binding public contract. 41 N.J. at 404-05; see also Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 97-104, 58 S. Ct. 443, 444-48, 82 L. Ed. 685, 689-93 (1938).

The State knows how to draft a contract to limit its financial obligation. Many state contracts include language

22

that the contractual terms are subject to appropriation by the Legislature. On the other hand, the State knows how to draft a binding public contract. In Spina, this Court set forth the conditions for the making of an enforceable legislative contract. The majority's reading of the Appropriations Clause renders Spina a nullity. It also runs afoul of the Federal Contracts Clause. If the enforceability of a contract depends on the willingness of the Legislature to appropriate money in any particular year, then, by the majority's logic, no contract is enforceable. That conclusion will come as a great surprise to many who count on the good faith and credit of the State in honoring its contractual commitments. The Appropriations Clause cannot stand as a barrier to the enforcement of federal or state constitutional rights, including contractual rights. See Brand, supra, 303 U.S. at 97-104, 58 S. Ct. at 444-48, 82 L. Ed. at 689-93; see also Abbott v. Burke (Abbott XXI), 206 N.J. 332, 363-64 (2011); N.J. Div. of Youth & Family Servs. v. D.C., 118 N.J. 388, 399-400 (1990).

In Missouri v. Jenkins, the United States Supreme Court held that the Supremacy Clause empowers federal courts to compel states to fulfill their constitutional obligations even if state-law provisions limit the means of appropriating funds to do so. 495 U.S. 33, 52-58, 110 S. Ct. 1651, 1663-67, 109 L. Ed. 2d 31, 55-58 (1990). In that vein, a state's claim to a lack of

23

available funding cannot excuse a state's constitutional non-compliance with minimal living and health standards for those kept in detention facilities. See, e.g., Hamm v. DeKalb Cnty., 774 F.2d 1567, 1573 (11th Cir. 1985) ("[S]tate's interest in limiting the cost of detention . . . will justify neither the complete denial of [food, living space, and medical care] nor the provision of those necessities below some minimally adequate level."), cert. denied, 475 U.S. 1096, 106 S. Ct. 1492, 89 L. Ed. 2d 894 (1986); Battle v. Anderson, 594 F.2d 786, 792 (10th Cir. 1979) ("[C]onstitutional treatment of human beings confined to penal institutions . . . is not dependent upon the willingness or the financial ability of the state to provide decent penitentiaries." (Internal quotation marks omitted)); Newman v. Alabama, 559 F.2d 283, 286 (5th Cir. 1977) ("[C]ompliance with constitutional standards may not be frustrated by legislative inaction or failure to provide the necessary funds[.]"), cert. denied, 438 U.S. 915, 98 S. Ct. 3144, 57 L. Ed. 2d 1160 (1978).

In Abbott XXI, supra, we rejected the State's argument that the appropriation power vested in the Legislature required this Court to defer to the Legislature's funding decisions that violated the rights of certain school children to a thorough and efficient education. 206 N.J. at 363-64. Simply stated, we held that the Legislature could not suspend a constitutional

24

right through a shortfall of appropriation.  Ibid.  In that case, we found that the State had underfunded its own school-aid formula and, by doing so, had visited substantial harm on the school children protected by our State Constitution.  Ibid.  The point made in Abbott XXI, and in other cases, is that the Appropriations Clause must bow to certain constitutional rights, and particularly to federal rights that have a privileged status under the Supremacy Clause.  In Chapter 78, the Legislature acknowledged that a violation of its funding commitment would constitute a contractual impairment, enforceable in Superior Court where presumably the public workers would invoke the Federal Contracts Clause.  See N.J.S.A. 43:3C-9.5(c)(2).  As in Abbott XXI, here too the State is not funding its own formula in violation of the Constitution.

Accordingly, the Appropriations Clause is not a bar to the enforcement of Chapter 78.  The majority reminds us that "the State fully understands the limits imposed by the fiscal clauses."  Ante at __-__ (slip op. at 60).  That being so, the State must have known that Chapter 78 was in compliance with those clauses when passed by the Legislature and signed by the Governor.

III.

A.

Even if the majority were correct about its interpretation

25

of the Debt Limitation and Appropriations Clauses, state law must bow to rights, such as contractual rights, protected by the United States Constitution.  Article VI, Clause 2 of the Federal Constitution, known as the Supremacy Clause, provides:  "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, <u>any Thing in the Constitution or Laws of any State to the Contrary notwithstanding</u>."  (Emphasis added).  The Federal Contracts Clause forbids precisely what the State did in this case -- legislatively impairing the contractual rights conferred on public workers by Chapter 78.

Article I, Section X, Clause 1 of the United States Constitution holds that "[n]o State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts . . . ."[3]  The Governor and Legislature have the sovereign authority to enter into contracts.  Indeed, the "[g]overnment's practical capacity to make contracts" is an integral part "of the essence of sovereignty itself."  <u>United States v. Winstar Corp.</u>, 518 <u>U.S.</u> 839, 884, 116 <u>S. Ct.</u> 2432,

---

[3] The New Jersey Constitution's Contracts Clause mirrors the Federal Contracts Clause.  It provides: "The Legislature shall not pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts, or depriving a party of any remedy for enforcing a contract which existed when the contract was made."  <u>N.J. Const.</u> art. IV, § 7, ¶ 3.

2459, 135 L. Ed. 2d 964, 997 (1996) (internal quotation marks omitted); see also United States v. Bekins, 304 U.S. 27, 51-52, 58 S. Ct. 811, 815-16, 82 L. Ed. 1137, 1144 (1938) ("It is of the essence of sovereignty to be able to make contracts . . . . The State is free to make contracts with individuals and give consents upon which the other contracting party may rely with respect to a particular use of governmental authority.").

Although the Governor and Legislature have the sovereign power to enter into contracts, "the Contract Clause limits the power of the States to modify their own contracts" as well as private contracts. U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 17, 97 S. Ct. 1505, 1515, 52 L. Ed. 2d 92, 106 (1977). The Framers of the United States Constitution intended the Contracts Clause to serve as an important restriction on the exercise of state power. The Clause was designed to protect "contracts from improvident majoritarian impairment." See Laurence H. Tribe, American Constitutional Law 613 (2d ed. 1988). Because debtors would always outnumber creditors, the Clause protects minority rights from legislative oppression at the hands of the majority.

The adoption of the Contracts Clause was largely the result of "widespread dissatisfaction with the Articles of Confederation" and "the mass of legislation enacted by various States during our earlier national period to relieve debtors

27

from the obligation to perform contracts with their creditors." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 256, 98 S. Ct. 2716, 2728, 57 L. Ed. 2d 727, 744 (1978). "[T]he sole evil at which the Contract Clause was directed was the theretofore rampant state legislative interference with the ability of creditors to obtain the payment or security provided for by contract." *Id.* at 257, 98 S. Ct. at 2729, 57 L. Ed. 2d at 744. The Contracts Clause was intended to apply "to laws which altered the obligations of contracts by effectively relieving one party of the obligation to perform a contract duty." *Ibid.*

The first state legislative enactment struck down by the United States Supreme Court in the early Republic involved a violation of the Contracts Clause. *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 3 L. Ed. 162 (1810). In *Fletcher*, a successor Georgia legislature revoked an earlier legislative grant of property to a person, who had conveyed it to another. *Id.* at 131-33, 3 L. Ed. at 176-77. Chief Justice Marshall found that the legislative annulment was a law impairing the obligation of contracts: "When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights . . . ." *Id.* at 135, 3 L. Ed. at 177. Importantly, in *Dartmouth College v. Woodward*, the United States Supreme Court emphasized that the Contracts Clause was

28

one of the "most important provisions in the national constitution," protecting fundamental property rights. 17 U.S. (4 Wheat) 518, 624, 4 L. Ed. 629, 656 (1819) ("Bills of attainder, ex post facto laws, and laws impairing the obligation of contracts, are contrary to the first principles of the social compact, and to every principle of sound legislation." (Internal quotation marks omitted)).

                                   B.

For purposes of the Contracts Clause, "a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." U.S. Trust Co., supra, 431 U.S. at 17 n.14, 97 S. Ct. at 1515 n.14, 52 L. Ed. 2d at 106 n.14. By that standard, Chapter 78 clearly expresses a legislative intent to convey enforceable contractual rights to public workers. Chapter 78 provides that public employees paying into the pension system "shall have a contractual right to the annual required contribution amount being made by" the State. N.J.S.A. 43:3C-9.5(c)(2) (emphasis added). That language is not aspirational, as the State contended for the first time at oral argument before this Court.

A finding that the State has a binding obligation under a contract is the first step in a contract-impairment analysis under federal law. Gen. Motors Corp. v. Romein, 503 U.S. 181,

186, 112 S. Ct. 1105, 1109, 117 L. Ed. 2d 328, 337 (1992). The next step is determining whether the State substantially impaired its contractual obligations by underfunding the pension system. See ibid. The issue is not resolved by resort to a mathematical formula. U.S. Trust Co., supra, 431 U.S. at 21, 97 S. Ct. at 1517, 52 L. Ed. 2d at 109. In analyzing whether the State substantially impaired its contract with public workers, a court must consider whether "the legitimate expectations of the contracting parties" have been violated and whether the State action "effectively reduced the value of substantive contract rights." Id. at 19 n.17, 97 S. Ct. at 1516 n.17, 52 L. Ed. 2d at 108 n.17; see also Energy Reserves Grp. v. Kan. Power & Light Co., 459 U.S. 400, 411, 103 S. Ct. 697, 704, 74 L. Ed. 2d 569, 580 (1983) ("Total destruction of contractual expectations is not necessary for a finding of substantial impairment.").

By any measure, the State's decision to cut pension funding by more than seventy percent constitutes a substantial impairment of the contractual rights of public employees. Under the formula set forth in Chapter 78, the State was required to make a contribution of $2.25 billion to the pension fund. Instead, the Appropriations Act for fiscal year 2015 allocated only $.68 billion -- a shortfall of $1.57 billion. Although public workers made their full contribution under the law, the State paid less than thirty percent of the amount required by

Chapter 78. Under Chapter 78, every public worker in the pension system has a "contractual right to the annual required contribution" to be made by the State "on a timely basis." N.J.S.A. 43:3C-9.5(c)(2). Chapter 78 specifies that the State's failure "to make the annually required contribution shall be deemed to be an impairment of the contractual right of each employee." Ibid. The Governor and Legislature -- by the statute they passed -- understood that severe underfunding of the pension fund would implicate a violation of the Federal Contracts Clause.

A finding of a substantial impairment, however, does not end the analysis. A State's impairment of a contract "may be constitutional if it is reasonable and necessary to serve an important public purpose." U.S. Trust Co., supra, 431 U.S. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112. Significantly, when the State impairs its own contract, as here, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." Id. at 26, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112 (emphasis added). Although the majority has an understandable distaste for judicial review of the State's finances, see ante at __-__ (slip op. at 64-66), it is nevertheless the role of the courts to protect constitutional rights -- no matter how difficult or unpopular, see U.S. Trust Co., supra, 431 U.S. 1, 97 S. Ct.

1505, 52 L. Ed. 2d 92. Judicial scrutiny is necessary because "[i]f a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all." Id. at 26, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112; see also Energy Reserves Grp., supra, 459 U.S. at 412 n.14, 103 S. Ct. at 705 n.14, 74 L. Ed. 2d at 581 n.14 ("When a State itself enters into a contract, it cannot simply walk away from its financial obligations.").

In assessing whether a State's impairment of its own contractual obligations is reasonable and necessary, two considerations must be kept in mind. U.S. Trust Co., supra, 431 U.S. at 29, 97 S. Ct. at 1521, 52 L. Ed. 2d at 114. First, as a general principle, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." Id. at 30-31, 97 S. Ct. at 1522, 52 L. Ed. 2d at 115. Second, "a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." Ibid.

Judge Jacobson -- the trial judge -- rejected the State's argument that its failure to fund the pension system was the result of an unanticipated revenue shortfall. Judge Jacobson found that "the State became aware of the alleged budget shortfall for FY 2015 over a year before the end of the fiscal

32

year." She determined that the failure to fund the pension system was not "a last resort measure" but rather "the primary target employed to address the revenue shortfall," despite Chapter 78's clear intent "to prevent a return to the approach that created the pension crisis in the first place." According to Judge Jacobson, "the State has continued to prioritize payment of other State contracts above payment of the contractual guarantee the State made with its public employees." She reviewed the certifications submitted by various administration officials and concluded that none "carefully considered" "alternative courses of action that would allow increased payments to the [pension system]."

Based on Judge Jacobson's findings, the State's impairment of the contractual rights of public workers under Chapter 78 by the drastic underfunding of its pension obligations was not "reasonable and necessary to serve an important public purpose." See id. at 25, 97 S. Ct. at 1519, 52 L. Ed. 2d at 112. Clearly, the State's payment of less than thirty percent of its annual required pension contribution for fiscal year 2015 constituted a substantial impairment of contractual rights of public employees in violation of the Federal Contracts Clause.

For sure, reviewing fiscal decisions made by the State is not a role that any court wants to play, but courts are the ultimate guarantors of constitutional rights. We cannot forsake

33

the task assigned to us under the Constitution and demanded of us by United States Trust Co., supra, 431 U.S. 1, 97 S. Ct. 1505, 52 L. Ed. 2d 92. Judge Jacobson took a judicious and measured approach by "refer[ing] the matter back to [the] Legislature and the Governor . . . [to] determine how best to accomplish the remedy."

## IV.

The majority's novel and strained interpretation of our State Constitution cannot defeat the federal rights of public workers in this case. The United States Supreme Court has held that although it will "accord respectful consideration and great weight to the views of the State's highest court," it will not permit a statutory interpretation that renders a "constitutional mandate . . . a dead letter." Brand, supra, 303 U.S. at 100, 58 S. Ct. at 446, 82 L. Ed. at 691. Thus, the Supreme Court will appraise for itself "the statutes of the State and the decisions of its courts" to determine "whether a contract was made, . . . its terms and conditions, and whether the State has, by later legislation, impaired its obligation." Ibid.; see also Gen. Motors Corp., supra, 503 U.S. at 187, 112 S. Ct. at 1110, 117 L. Ed. 2d at 337 ("The question whether a contract was made is a federal question for purposes of Contract Clause analysis and whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment."

34

(Internal quotation marks and citation omitted)); Irving Trust Co. v. Day, 314 U.S. 556, 561, 62 S. Ct. 398, 401, 86 L. Ed. 452, 457 (1942) (stating that when court "is asked to invalidate a state statute" on ground that it violates Federal Contracts Clause, "the existence of the contract and the nature and extent of its obligation become federal questions . . . and for such purposes finality cannot be accorded to the views of a state court").

In Brand, supra, the United States Supreme Court looked behind the Indiana Supreme Court's interpretation of Indiana contract law to find a legislative impairment of a teacher's tenure rights. 303 U.S. at 104-05, 109, 58 S. Ct. at 448, 450, 82 L. Ed. at 693, 695. In that case, the Indiana legislature repealed the state's existing teacher tenure law, allowing the discharge of a teacher who had attained tenure. Id. at 97, 58 S. Ct. at 444, 82 L. Ed. at 689. The Indiana Supreme Court held that the teacher's Federal Contracts Clause rights were not impaired by the statute's repeal because the teacher did not have a contractual right under the tenure law. Id. at 97-98, 58 S. Ct. at 445, 82 L. Ed. at 689. The United States Supreme Court read Indiana contract law differently, finding that the repealed tenure law had granted tenured teachers a contractual right to their positions for an "indefinite period." Id. at 102, 104, 58 S. Ct. at 447-48, 82 L. Ed. at 692-93. The United

35

States Supreme Court rejected the Indiana high court's reasoning that the legislature's control over "public policy . . . cannot be contracted away by one legislature so as to create a permanent public policy unchangeable by succeeding legislatures." Id. at 99, 58 S. Ct. at 445, 82 L. Ed. at 690. The Court recognized that "a legislative enactment may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the State." Id. at 100, 58 S. Ct. at 446, 82 L. Ed. at 690-91. In concluding that the teacher had a contractual right under the state's tenure law, the Court independently reviewed Indiana statutes and the state's court decisions. Id. at 100, 58 S. Ct. at 446, 82 L. Ed. at 691. The Court then analyzed the language of the teacher tenure law, which repeatedly used the word "contract" to define the relationship between the teacher and school district. Id. at 105, 58 S. Ct. at 448, 82 L. Ed. at 693. Based on the tenure law's language and the Indiana Supreme Court's previous decisions, the Court concluded that "the teacher was . . . assured of the possession of a binding and enforceable contract against school districts." Id. at 105, 58 S. Ct. at 448, 82 L. Ed. at 693.

In enacting Chapter 78, the Legislature and Governor relied on this Court's holding in Spina, supra, that an enforceable public contract could be established through legislation if it

36

were "so plainly expressed that one cannot doubt the individual legislator understood and intended it." See 41 N.J. at 405. Through its unprecedented construction of the Debt Limitation and Appropriations Clauses, the majority has rendered Spina a dead letter.

The majority pretends that it is not "declaring Chapter 78 unconstitutional" and that "Chapter 78 remains in effect, as interpreted, unless the Legislature chooses to modify it." Ante at __-__ (slip op. at 61). Words, however, matter. As a result of the majority's decision, the State's contribution to the pension system is no longer binding, but merely optional.

V.

Finally, if the central beam of Chapter 78 is defective, as the majority claims, then the whole statutory structure should fall. See 2 Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction § 44:7, at 622 (7th ed. 2009) ("Where the purpose of a statute is defeated by the invalidity of part of the act, the entire act is void."). Chapter 78 was the product of a historic compromise, trumpeted by the Governor and Legislature, requiring public workers to accept greater pension deductions from their paychecks in exchange for the State making required annual contributions to ensure the solvency of the pension system. Having relieved the Governor and Legislature of the obligations they assumed by passing Chapter 78, the majority

37

keeps in place the increased payments mandated of public workers under the law. The Legislature could not have contemplated that the compromise reached by passage of Chapter 78 would result in only public workers holding the bag. It is difficult to imagine that the Legislature would have passed Chapter 78 had it imagined today's decision.

Notwithstanding Chapter 78's severability clause, L. 2011, c. 78, § 81 (stating that invalidation of one provision "shall be severable and shall not affect the validity of other provisions or applications of this act"), it is entirely clear that the Legislature "designed that the enactment should stand or fall as a unitary whole." See State v. Lanza, 27 N.J. 516, 527 ("A severability clause 'provides a rule of construction which may sometimes aid in determining [the Legislature's] intent. But it is an aid merely; not an inexorable command.'" (quoting Dorchy v. Kansas, 264 U.S. 286, 290, 44 S. Ct. 323, 325, 68 L. Ed. 686, 690 (1924))), appeal dismissed, 358 U.S. 333, 79 S. Ct. 351, 3 L. Ed. 2d 350 (1959). Courts must "consider whether the invalid section served as a principal or significant inducement to passage." Inganamort v. Borough of Fort Lee, 72 N.J. 412, 424 (1977). Here, there can be no doubt that the central inducement to the passage of Chapter 78 was the portion requiring the State to pay its fair share into the pension system. Under Chapter 78, the State's promise to make

38

its annual required contribution was the consideration for public workers making greater financial sacrifices to ensure the solvency of the pension system.  Now that the majority has relieved the State of its obligation, the mutuality that supported the public contract embodied in Chapter 78 is gone. The Legislature surely did not intend that just one party to the contract -- public workers -- would be held to its terms.

                              VI.

     Today's outcome undoubtedly will dishearten public workers. The majority holds that the solemn representations made to them by their government can be dishonored.  The executive branch proposed and signed into law Chapter 78, touted it publicly, and then -- when the bill came due -- successfully argued in court that the law was unconstitutional.

     The epilogue to the present appeal is that the pension rights of public workers are expendable in budgeting priorities. The majority asserts that public workers "are entitled to [the] delayed part of their compensation upon retirement." Ante at __-__ (slip op. at 61-62 n.11).  But the majority has not explained how they will be paid when the pension fund is empty and how its assurance can be squared with its inflexible interpretation of the Debt Limitation Clause and the Appropriations Clause, an interpretation that overthrows this Court's decision in Spina.  If the majority is making a legally

                              39

binding guarantee on some future Court and some future generation, it should say how its promise will be fulfilled.  On its present trajectory, the pension fund will become insolvent.  If that occurs, then to make good the majority's promise, some future Court may have to intrude into the political process and determine funding priorities, which the majority now so strongly condemns.  I am unwilling to put off enforcement of the federal constitutional rights of public workers to a time when some future Court will find any feasible solution beyond reach.

The majority takes heart in the State's representation "at oral argument that it is not walking away from its obligations to the pension systems and to pay benefits due to retirees."  Ante at __-__ (slip op. at 61-62 n.11).  The record does not inspire such confidence.  After all, the State has not fulfilled its obligation to fund the pension system since 1997.  Moreover, it was the State that passed Chapter 78 one day, and argued its unconstitutionality the next.

Chapter 78 was enacted to impose fiscal discipline on the political branches of government.  At the end of every fiscal year since 1997, including this year, the budget has been balanced at the expense of public workers.  If the past is prologue, the solvency of the pension system is in great peril.  The majority declares that the contractual rights conferred in Chapter 78 must be sanctioned by voter approval -- a public

40

plebiscite. However, the Federal Contracts Clause was intended to protect contractual rights from the whims of the majority.

I conclude that the contractual rights of public workers, guaranteed by Chapter 78, have been substantially impaired in violation of the Federal Constitution. I would give public workers the relief to which they are entitled and send the matter back to the political branches to comply with the law of their making. I therefore respectfully dissent.

CHIEF JUSTICE RABNER joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO.   A-55                         SEPTEMBER TERM 2014

ON APPEAL FROM    Superior Court, Law Division, Mercer County

CHRISTOPHER BURGOS, et al.,

     Plaintiffs-Respondents,

          v.

STATE OF NEW JERSEY, et al.,

     Defendants-Appellants.

DECIDED            June 9, 2015
          Chief Justice Rabner            PRESIDING

OPINION BY      Justice LaVecchia

CONCURRING/DISSENTING OPINIONS BY

DISSENTING OPINION BY      Justice Albin

| CHECKLIST | REVERSE | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | | X |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | | X |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 5 | 2 |